[821 NYS2d 40]

RAYMOND J. HOESTEN, Respondent-Appellant, v CONSTANCE BEST, Appellant-Respondent, and MITCH McGUIRE, as Treasurer of the American Federation of Television and Radio Artists, New York Local, Respondent.

First Department, September 7, 2006

**APPEARANCES OF COUNSEL**

*Cohen, Weiss & Simon LLP*, New York City (*Peter D. DeChiara* of counsel), for Constance Best, appellant-respondent and another, respondent.

*Law Office of Michael K. O'Donnell*, Greenwich, Connecticut (*Michael K. O'Donnell* of counsel), for respondent-appellant.

**OPINION OF THE COURT**

Gonzalez, J.

This is an action for defamation and tortious interference with prospective business relations commenced by plaintiff Raymond J. Hoesten, a former stage manager for the daytime television drama "One Life to Live" (OLTL). Plaintiff alleges that his employment was terminated in 1998 by the ABC television network as a result of certain defamatory communications published by defendant Constance Best, in her role as executive assistant to the American Federation of Television and Radio Artists, New York Local (AFTRA), the union that represents the actors employed by ABC on OLTL. The statements by Best generally criticized plaintiff's professional competence by alleging abuse and mistreatment of actors and extras on the show.

In determining the propriety of the motion court's rulings, we are asked to determine whether consideration of some of Best's allegedly defamatory statements is barred by the statute of limitations, whether the state law defamation claims asserted by plaintiff are preempted by federal law, and whether plaintiff has raised a triable issue of fact on the question of whether Best's statements were spoken with actual or common-law malice.

For the reasons stated below, we find that Best's statements made prior to July 1998 are barred by the statute of limitations, that federal law preempts plaintiff's state law claims to the extent they are not supported by a showing of actual malice, and that plaintiff has failed to raise a triable issue on the question of actual or common-law malice. We also agree with Supreme Court's determination that the claims against AFTRA are barred by the Court of Appeals decision in *Martin v Curran* (303 NY 276 [1951]). Accordingly, we modify and dismiss the complaint against both defendants.

Facts

Prior to his dismissal, plaintiff worked as a freelance stage manager for 26 years pursuant to a collective bargaining agreement between ABC and the Directors Guild of America. Plaintiff had no written employment contract with ABC. In his capacity as stage manager, plaintiff's responsibilities included positioning and cuing the actors and relaying instructions from the control booth to the performers. Best was employed by AFTRA in various positions since 1981: she was AFTRA's field representative assigned to monitor the set of OLTL from 1981 to 1988, supervisor of field representatives from 1988 to 1992, and executive assistant of AFTRA from 1992 to the date plaintiff was terminated.

Between 1995 and 1998, Best received numerous complaints regarding plaintiff's conduct from actors on OLTL.[1] The actors generally complained that plaintiff yelled, insulted their intelligence or their ability as actors, and inappropriately pushed or pulled them into place on the set. On some occasions, Best made notes in her log regarding these complaints and informed ABC representatives about them, orally or in writing.

For example, on February 13, 1995, after receiving a complaint about plaintiff from one of the actresses, Best wrote a letter to ABC stating that after plaintiff became "agitated" when some of the actors didn't realize he was speaking to them, he yelled, "They call themselves fu—ing actors, and they don't know how to take directions."

On February 4, 1997, one of the actors told Best that plaintiff humiliated him by dismissing him in front of the entire crew. Best orally informed ABC of this incident.

On November 12, 1997, Best wrote a letter to ABC's in-house labor relations attorney summarizing a complaint she had received from an actress six days earlier. The letter states that plaintiff engaged in "serious verbal and physical abuse of background performers" in that he "repeatedly tugs, pushes, and pulls actors into position, instead of using verbal cues or hand gestures." The letter further alleged that plaintiff "follows a pattern of intimidation and humiliation, and is a cause of tension on the set." Each of these quoted statements was mentioned in plaintiff's complaint as an example of Best's defamatory utterances.

On July 24, 1998, Best sent another letter to ABC reporting the complaints of two additional actors. Best stated in the letter that the first actor had been instructed to stay out of several scenes but had entered the shot during the last scene, at which point plaintiff yelled at him, "What the f—k are you doing in the shot!" When the actor tried to check his notes, plaintiff slammed his notebook shut and walked away. The second complaint involved an Asian-American actress hired as an extra, who had been given a script with her name on it. According to Best's letter, when the actress appeared on the set and showed

---

**1.** Although not the subject of this action, additional complaints were made to ABC in 1997 about plaintiff's misconduct on the set, including his use of vulgar and offensive language. As a result, on May 27, 1997, ABC issued a caution letter to plaintiff that his use of inappropriate language was "unprofessional and violates company policy." The letter concluded by asserting that ABC "reserve[d] the right to take further action" if such conduct recurred.

plaintiff the script, "He exploded, called her an idiot, and asked if she stole the script from someone's dressing room." In addition, Best reported that plaintiff made "a remark to the effect, that the sushi she had for lunch made her unable to follow directions." Best concluded the letter by stating that "These are examples of [plaintiff's] pattern of disparagement and intimidation of actors." The statements from this letter were quoted in full in plaintiff's complaint.

Prior to sending the July 24, 1998 letter, Best read it over the phone to the actors involved, neither of whom indicated that it was inaccurate. Best also testified at her deposition that two other AFTRA members, whose names she didn't record, told her in phone conversations that they had witnessed the incident between plaintiff and the Asian-American actress. Best also told AFTRA's field representative at the time that she intended to send the letter, but does not recall any reaction by the latter.

After receiving Best's July 24, 1998 letter, ABC's director of employee relations spoke to the two actors whose complaints were reported, in order to confirm their complaints. The actors related the same incidents described in Best's letter to the ABC director, who believed them because they seemed "extremely credible," the actors appeared "uncomfortable and intimidated," and their complaints were consistent with other complaints about plaintiff.

On August 21, 1998, Best met with ABC's counsel for labor relations, the executive director of production services and the director of employee relations regarding plaintiff's conduct. Best left the meeting satisfied that ABC was going to look into the complaints she had relayed, but no action was immediately taken to rectify the situation. However, three weeks later, on September 11, the executive producer of OLTL sent an e-mail to the executive director of production services reporting that she had witnessed "unacceptable behavior" by plaintiff in his treatment of actors. According to the producer, plaintiff had loudly chastised the actors, publicly embarrassing and humiliating them. The producer concluded, "I will not tolerate such treatment toward anyone who works on this show by a stage manager or anyone else for that matter." On September 14, 1998, ABC informed plaintiff that it had chosen to terminate his employment as a freelance stage manager.

Plaintiff commenced the instant action on July 22, 1999, asserting causes of action for defamation and tortious interference with employment. Defendants moved for summary judgment

seeking dismissal of the complaint on various grounds. In a July 29, 2005 order, Supreme Court granted the motion to the extent of dismissing the action as against AFTRA, but denied Best's motion on several grounds. First, the court rejected Best's argument that the one-year statute of limitations barred plaintiff's claims as to defamatory statements made before July 22, 1998 based on the "single publication rule," holding that Best republished her remarks at the August 21, 1998 meeting with ABC representatives. Nevertheless, the court accepted Best's argument that plaintiff failed to set forth her remarks from that meeting and other occasions with particularity as required by CPLR 3016 (a), and accordingly, it limited its consideration to the statements made in Best's July 24, 1998 letter.

Further, the motion court rejected defendant's argument that the National Labor Relations Act (NLRA) preempted plaintiff's defamation claims in state court, finding that Best's remarks did not arise out of a labor dispute within the meaning of the NLRA. The court held that, under state law, although Best's statements were qualifiedly privileged based on the common interest of AFTRA and ABC in the matters communicated, a triable issue of fact existed as to whether Best abused said privilege by speaking with actual or common-law malice. Similarly, the court denied dismissal of the tortious interference claim against Best on the ground that a triable issue existed on the question of malice.

Finally, the court dismissed the action against AFTRA based on *Martin v Curran* (303 NY 276 [1951], *supra*), where the Court found that in order for a cause of action to exist against a union, the plaintiff must allege that all members have ratified an intentionally tortious act. These cross appeals followed.

Defendant Best makes three primary arguments for dismissal of the action against her: the motion court's statute of limitations ruling was based on an erroneous interpretation of the single publication rule; the court's finding of no preemption is contrary to the broad interpretation of "labor dispute" afforded by federal law; and the court erred in finding a triable issue of fact as to malice. We address these arguments seriatim.

Statute of Limitations

Best argues that Supreme Court erred in rejecting her contention that all of her allegedly defamatory statements made prior to July 22, 1998 were time-barred. Specifically, she challenges the court's ruling that Best republished her defamatory remarks at the August 21, 1998 meeting with ABC executives.

We agree with Best and hold that judicial consideration of plaintiff's claims must be limited to those statements made by Best on or after July 22, 1998.

The statute of limitations applicable to defamation claims is one year (CPLR 215 [3]), and generally accrues on the date of the first publication (*Gelbard v Bodary*, 270 AD2d 866 [2000], *lv denied* 95 NY2d 756 [2000]). Under the "single publication rule," which New York follows, the publication of a defamatory statement in a single issue of a newspaper or magazine, although widely circulated and distributed, constitutes one publication that gives rise to one cause of action, and the statute of limitations runs from the date of that publication (*Firth v State of New York*, 98 NY2d 365, 369 [2002]; *Gregoire v Putnam's Sons*, 298 NY 119, 123 [1948]; *Gelbard* at 866-867). Stated differently, "neither the time nor the circumstance in which a copy of a book or other publication finds its way to a particular consumer is, in and of itself, to militate against the operation of the unitary, integrated publication concept" (*Rinaldi v Viking Penguin*, 52 NY2d 422, 433 [1981]). The Court of Appeals has stated that the rationale underlying this rule is the prevention of "endless retriggering of the statute of limitations, multiplicity of suits and harassment of defendants" (*Firth*, 98 NY2d at 370; *see also Van Buskirk v New York Times Co.*, 325 F3d 87, 89 [2d Cir 2003]).

An exception to the single publication rule is the concept of "republication," relied upon by Supreme Court in this case. "Republication, retriggering the period of limitations, occurs upon a separate aggregate publication from the original, on a different occasion, which is not merely 'a delayed circulation of the original edition' " (*Firth*, 98 NY2d at 371, quoting *Rinaldi*, 52 NY2d at 435; Restatement [Second] of Torts § 577A, Comment *d*). The republication exception has been applied most frequently where "the subsequent publication is intended to and actually reaches a new audience" (*Firth* at 371), and other relevant considerations include whether the second publication is made on an occasion distinct from the initial one (*see Lehman v Discovery Communications, Inc.*, 332 F Supp 2d 534, 539 [ED NY 2004] [rebroadcast of program has renewed impact with each viewing and creates new opportunity for injury]), whether the republished statement has been modified in form or in content (*see Zoll v Jordache Enters., Inc.*, 2002 WL 31873461, *11, 2002 US Dist LEXIS 24570, *34-35 [SD NY] [modification or alteration of original is sine qua non of a republication]), and

whether the defendant has control over the decision to republish (*Lehman v Kornblau*, 12 Misc 3d 1, 3-4 [App Term 2006] [defendant not responsible for republication over which she had no control]).

Applying these principles to the present case, we hold that Best's statements at the August 1998 meeting with ABC did not constitute a republication. First, contrary to Supreme Court's finding that Best's communications "reached many new recipients," the statements by Best at the meeting were made to three ABC executives who were already intimately familiar with the complaints previously levied against plaintiff. Indeed, one of the persons present, ABC's in-house attorney for labor relations, was the recipient of Best's November 1997 and July 1998 letters complaining about plaintiff's conduct, and the other two executives were involved in the 1997 investigation that earned plaintiff a warning letter in May of that year. Thus, even if ABC as an entity is not considered a single audience for republication purposes, the three executives who heard Best's statements at the August 1998 meeting cannot reasonably be seen as a new audience (*cf. Lehman v Discovery Communications, Inc.*, 332 F Supp 2d at 539).

Other factors exist that support application of the single publication rule. Although Supreme Court tried to differentiate between Best's earlier letters and her statements at the meeting (the former being "unilateral and informational," while the latter were characterized as "bilateral and executory"), insofar as the record shows, the statements were identical reports of the complaints that Best had previously reported in her letters or orally. Thus, although Best's statements at the meeting certainly were made on a new occasion, they nonetheless were made to the same audience and involved the identical subject matter. Accordingly, they were more akin to a delayed release of previously published matter as opposed to a distinct republication (*see Gelbard*, 270 AD2d at 867 [restating to a committee the allegedly defamatory contents of a letter earlier sent did not retrigger limitations period where no distinct republication]). Accordingly, because no republication occurred, any statement by Best made prior to July 22, 1998 is barred from consideration by the one-year statute of limitations.

We also note that our ruling on the statute of limitations question eliminates the need to address one of plaintiff's arguments on the cross appeal. Specifically, plaintiff argues that the motion court erred in considering only those statements made

by Best in the July 24, 1998 letter on the ground that they were the only statements in plaintiff's complaint identified with any particularity as required by CPLR 3016 (a). As plaintiff notes, however, this ruling was incorrect since he did in fact quote from Best's November 1997 letter in the complaint. Nevertheless, the error need not detain us, as our statute of limitations ruling precludes consideration of this statement in any event.

Plaintiff also argues that even if Best's statements at the August 1998 meeting did not constitute a republication, the Court should have permitted him to amend his complaint to plead these independent defamatory statements with particularity pursuant to CPLR 3016 (a). Best responds that plaintiff never cross-moved to amend his complaint in the motion court and never attached a proposed amended pleading to permit the motion court to evaluate his proof in light of the CPLR 3016 (a) requirement. In our view, the absence of any cross motion by plaintiff renders the court's implicit denial of leave to amend a proper exercise of discretion. In any event, our rulings on preemption and qualified privilege (*see infra*) render the denial of leave to amend academic.

Preemption of State Law of Defamation

 Best next argues that the motion court erred in holding that federal labor law did not preempt state defamation law because, contrary to the court's finding, Best's complaints to ABC fell within the definition of a "labor dispute" under the NLRA, and further constituted protected activity under sections 7 and 8 of that Act. We agree.

The United States Supreme Court has held that state law regulation of speech is partially preempted by the NLRA and federal labor law policy when the speech is uttered in the context of a "labor dispute" or arguably implicates the rights protected by section 7 or 8 of said Act (*San Diego Building Trades Council v Garmon*, 359 US 236 [1959]; *see also Letter Carriers v Austin*, 418 US 264, 273 [1974]; *Linn v Plant Guard Workers*, 383 US 53 [1966]). Federal preemption is only partial in this context because, as the Supreme Court held in *Linn* (*supra* at 64-65), the NLRA does not protect speech uttered with actual malice, i.e., statements published with knowledge of their falsity or with reckless disregard of whether they were true or false (*see New York Times Co. v Sullivan*, 376 US 254 [1964]).

The parties' disagreement on whether the *Linn* preemption rule applies in this case hinges on the proper interpretation of

the term "labor dispute," as well as the scope of protection afforded by sections 7 and 8 of the NLRA. As the Supreme Court itself noted in *Letter Carriers* (418 US at 279), this is not an easy determination to make:

> "[W]hether *Linn's* partial pre-emption of state libel remedies is applicable obviously cannot depend on some abstract notion of what constitutes a 'labor dispute'; rather, application of *Linn* must turn on whether the defamatory publication is made in a context where the policies of the federal labor laws leading to protection for freedom of speech are significantly implicated."

The motion court found no "labor dispute" in this case because Best's remarks did not arise from a traditional labor controversy such as union elections, contract negotiations or strikes, and because they were not presented as a formal grievance referencing the collective bargaining agreement. This was error. The term "labor dispute" is defined by the NLRA as including *"any* controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment" (29 USC § 152 [9] [emphasis added]). Many courts have noted that this definition is "very broad" (*Beverly Hills Foodland, Inc. v United Food & Commercial Workers Union, Local 655*, 39 F3d 191, 195 [8th Cir 1994]), concluding that where a union engages in acts for some arguably job-related reason, a labor dispute exists (*id.*, citing *Hasbrouck v Sheet Metal Workers Local 232*, 586 F2d 691, 694 n 3 [9th Cir 1978]).

Here, Best, in her capacity as union representative, complained to ABC regarding the mistreatment of union members by a stage manager employed by ABC. Undoubtedly, these persistent complaints fell within the broad definition of "any controversy" regarding these actors' conditions of employment (*see Matter of Aladdin Indus. [United Auto. Workers of Am., Local No. 171]*, 22 NLRB 1195, 1216 [1940], *enforced in part sub nom. National Labor Relations Bd. v Aladdin Indus.*, 125 F2d 377 [7th Cir 1942], *cert denied* 316 US 706 [1942]). The complaints forwarded by Best on behalf of union members were unquestionably made for a "job-related" reason (*Beverly Hills Foodland*, 39 F3d at 195), and Best further testified that despite her many complaints, no steps were taken to rectify the situation. Thus, although the dispute between Best and ABC

regarding the mistreatment of AFTRA members did not fall within the classic format of a labor controversy, such as contract negotiations or strikes, it nevertheless was a dispute over working conditions between union members and management (ABC), and thus, constituted a "labor dispute" under the NLRA.

We note that courts of many sister states have found the existence of a "labor dispute" notwithstanding the absence of any contract negotiations, union organizing campaigns, elections or strikes (see e.g. *Heinlen v Ohio Civ. Serv. Empls. Assn.*, 2002 Ohio 1395, 2002 WL 462865, 2002 Ohio App LEXIS 1383 [defamatory statement in union newsletter accusing supervisor of assaulting employee during meeting arose from "labor dispute"]; *AFC Roofing & Insulation, Inc.*, 1997 WL 33347968, *2, 1997 Mich App LEXIS 1642, *4 [union representative's accusation at city council meeting on proposed wage ordinance that employer hired illegal immigrants was made in labor dispute since ordinance would alter terms and conditions of employment]; see also *Tosti v Ayik*, 386 Mass 721, 724, 437 NE2d 1062, 1064 [1982]).

Nor can we agree with the motion court's finding that this case "does not implicate any of the rights enumerated in Section 7" of the NLRA. Section 7 provides, in pertinent part: "Employees shall have the right to self-organization, to form, join, or assist labor organizations . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection" (29 USC § 157). Many federal courts and decisions of the NLRB have held that this section protects employee conduct aimed at protesting adverse working conditions, including those caused by the misconduct of supervisory employees (see *Trompler, Inc. v National Labor Relations Bd.*, 338 F3d 747, 749 [7th Cir 2003]; *FiveCAP, Inc. v National Labor Relations Bd.*, 294 F3d 768, 783 [6th Cir 2002]; *Georgia Farm Bur. Mut. Ins. Cos. [Knight]*, 333 NLRB 850 [2001]).

Here, Best was acting on behalf of the many union members who were employed on the show, and was doing so for their "mutual aid or protection." The fact that the complaints were made by Best, a union employee, and not by the "concerted activities" of the employees-members themselves, does not forfeit the protection of section 7 (see *BE & K Constr. Co. [Steamfitters Local 342, United Assn. of Journeymen & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Can., AFL-CIO]*, 329 NLRB 717, 725-726 [1999], *enforced sub nom. BE&K*

*Constr. Co. v National Labor Relations Bd.*, 246 F3d 619 [6th Cir 2001], *revd on other grounds* 536 US 516 [2002] [concerted activity is not unprotected simply because it is engaged in by unions]). Nor, contrary to Supreme Court's holding, is there any requirement that protected activity under section 7 be presented as a formal grievance referencing the applicable collective bargaining agreement (*see NLRB v Washington Aluminum Co.*, 370 US 9, 15-16 [1962] [section 7 protected walkout by small group of unorganized employees]).

Accordingly, because Best's complaints to ABC about plaintiff's conduct arose out of a "labor dispute" within the meaning of the NLRA, or "arguably" constituted protected activity under section 7 of that Act, or both, plaintiff's state-law defamation claims are partially preempted to the extent that they were not uttered with actual malice (*Linn*, 383 US at 59-60; *O'Neil v Peekskill Faculty Assn.*, 120 AD2d 36, 42 [1986], *lv dismissed* 69 NY2d 984 [1987] [state libel actions for statements in labor dispute are partially preempted by federal law, and are permitted only where actual malice is shown]).

Triable Issue of Actual Malice

A plaintiff who brings a defamation action challenging speech that is protected under federal labor law must satisfy the actual malice standard set forth in *New York Times Co. v Sullivan* (376 US 254 [1964]). Under that standard, the plaintiff must show by clear and convincing evidence that the defendant's statements were made with knowledge of their falsity or with reckless disregard of whether they were true or false (*id.* at 279-280). The standard is a subjective one, focusing on the speaker's state of mind (*Goldblatt v Seaman*, 225 AD2d 585, 586 [1996]), and mere proof of falsity will not be sufficient to establish liability. Rather, the plaintiff has the burden of showing by clear and convincing evidence that the defendant made the statement while highly aware that it was probably false (*Liberman v Gelstein*, 80 NY2d 429, 438 [1992]; *see also Sweeney v Prisoners' Legal Servs. of N.Y.*, 84 NY2d 786, 793 [1995]; *Bose Corp. v Consumers Union of United States, Inc.*, 466 US 485, 511 n 30 [1984]).[2]

Best argues that plaintiff has produced no evidence, let alone clear and convincing evidence, showing that she was "highly

---

2. We reject plaintiff's argument that the *New York Times* standard does not apply here because he is not a public figure. In cases where federal labor law preempts state law, the *New York Times* standard is applicable regardless of the status of the plaintiff.

aware" that her statements made to ABC in the July 1998 letter were probably false. In that letter, Best reported the complaints of the two actors regarding plaintiff's obnoxious and belittling conduct and further characterized the two incidents as "examples of [plaintiff's] pattern of disparagement and intimidation of actors." Although she did not have first-hand knowledge of the incidents, she spoke to both actors over the telephone and read them the contents of her letter before sending it. In addition, Best states in her affidavit that she believed the complaints of these two actors.

Additional corroborative evidence supports Best's argument there was no objective reason to doubt the credibility of these complaints. First, in addition to these two complaints, Best had received many others concerning plaintiff's conduct on the set, some of which she reported. Second, the complaints were all very similar, consisting of plaintiff's use of vulgar language and humiliating conduct toward the actors. Third, Best spoke to two other AFTRA members who witnessed plaintiff's incident with the Asian-American actress and both confirmed that it was plaintiff who made the "sushi" remark. Fourth, after receiving the letter, ABC's director of employee relations confirmed that he also found the two actors' complaints "extremely credible," particularly since other people had reported similar behavior by plaintiff.

The motion court gave three examples of evidence it believed raised a triable issue on the question of malice, none of which withstands scrutiny. With respect to the "sushi" remark, the court noted that plaintiff denied being on the set when those words were spoken, that an eyewitness stated that another stage manager was the actual declarant, and that the declarant himself admitted making the statement. However, as Best notes, while such evidence might raise a triable issue as to whether plaintiff in fact made the offensive remark, it does not raise a triable issue on the only legal question before the court— whether Best was "highly aware" at the time she made the remark that plaintiff probably was not the speaker (*see Heinlen v Ohio Civ. Serv. Empls. Assn.*, 2002 Ohio 1395, 2002 WL 462865, 2002 Ohio App LEXIS 1383). No such evidence exists in this record, since the statements attributed to the eyewitness and alleged declarant were not made known to Best until *after* she sent the letter. In short, at the time she sent the letter, Best relied on the two actors' first-hand statements of the incident and there is no evidence that she had any contradictory evidence in her possession.

The court also relied on the facts that Best "did not investigate the allegations and refused to meet with Hoesten to discuss the complaints." The first part of this statement is clearly refuted by the undisputed evidence that Best spoke to both actors before sending the July 1998 letter, as well as two other AFTRA members who were eyewitnesses and the AFTRA field representative. Moreover, Best's failure to discuss the allegations with plaintiff himself cannot raise a triable issue, since under the *New York Times* standard, the failure to investigate the truth of the statements cannot, by itself, constitute actual malice (*see Masson v New Yorker Magazine, Inc.*, 501 US 496, 510 [1991]; *Liberman*, 80 NY2d at 438-439; *Sweeney*, 84 NY2d at 794). Although the *Sweeney* court further held that a defendant can be liable if he or she "evidences an intent to avoid the truth," no such intent can be found "[a]bsent some direct evidence that defendants . . . were aware that [the] complaint was probably false" (*id.* at 793). As indicated, plaintiff has produced no such evidence in this case.

Finally, in finding a triable issue on the question of malice the motion court stated that "Best arguably revealed a bias when she characterized five alleged incidents out of thousands of interactions during plaintiff's 26 years on the 'One Life to Live' set as 'a pattern of verbal and physical abuse.' " Again, the court misread the record since Best's statement in the July 1998 letter, the only letter the motion court considered, was that plaintiff engaged in a "pattern of disparagement and intimidation." In any event, given the multiple complaints that Best received about plaintiff over the course of three years, all of which concerned similar conduct, it was entirely accurate for Best to describe plaintiff's instances of misconduct as a "pattern."

Accordingly, because plaintiff failed to raise a triable issue of fact on the issue of actual malice, plaintiff's claims were preempted by federal law.

Qualified Privilege

■ Best also contends that even if plaintiff's claims were not preempted by federal law, they should have been dismissed pursuant to the state law doctrine of qualified privilege. It is well established that even where a statement is defamatory, a qualified privilege exists where the communication is made to persons who share a common interest in the subject matter (*Foster v Churchill*, 87 NY2d 744, 751 [1996]; *Liberman*, 80 NY2d at 437). The defense of qualified privilege will be defeated,

however, where it is demonstrated that the defendant's statements were uttered with malice, which includes either common-law malice (motivated by spite or ill will) or constitutional malice (statements made with a high degree of awareness of their probable falsity) (*Foster*, 87 NY2d at 751-752).

Although the motion court properly held that Best's statements were qualifiedly privileged because AFTRA and ABC shared a common interest in preventing mistreatment of AFTRA members in the workplace, it erroneously concluded that plaintiff had raised a triable issue as to whether Best's statements were "motivated by ill will or [she] acted in reckless disregard of the falsity of her reports." As we have already determined that no triable issue exists regarding actual malice under the *New York Times* standard, we confine our analysis to the court's findings on common-law malice.

In order to establish a triable issue regarding common-law malice, a defamed plaintiff must show that a jury could reasonably conclude that the speaker spoke out of spite or ill will, and that such malicious motivation "was the one and only cause for the publication" (*Stukuls v State of New York*, 42 NY2d 272, 282 [1977]; *Liberman*, 80 NY2d at 439). Plaintiff alleges that Best held a grudge against him for his participation in certain racially motivated acts toward Best by a former executive producer of OLTL. According to plaintiff, the producer required plaintiff, the stage manager, to exclude Best from the set because he disliked black people. Thus, plaintiff claims he was "caught in the middle between his bigoted boss and a black union representative."

Whatever the truth of this dubious allegation, we find that it does not raise a triable issue regarding whether the statements in Best's 1998 letter were made with common-law malice. Initially, Best's complaints occurred in 1998, at least eight years after the alleged discriminatory conduct, and no explanation is offered why Best would wait so long to exact revenge. Additionally, there is no evidence in the record that Best was ever made aware of the reasons for her exclusion. She testified that she assumed it was because she was the union representative and "[u]nion reps are normally thorns in the side of producers." Further, there was little objective reason for Best to blame plaintiff, who testified that he always expressly blamed the exclusion on the producer.

Even if Best harbored some grudge against plaintiff, it would be manifestly unreasonable to conclude that such ill will was

the only reason for Best's complaints. No one disputes that the complaints were in fact made by the actors, and it is also undisputed that it was Best's principal responsibility to protect AFTRA members with respect to their working conditions and rights under the collective bargaining agreement. There is not a hint in the record that Best concocted the complaints herself or affirmatively encouraged the actors to do so. In sum, because it was Best's job to bring any complaints of AFTRA members to the attention of the employer, and to seek some remedy, there clearly was some other reason which motivated Best's statements. Accordingly, the privilege was not abused by Best.

■ Best contends that plaintiff's tortious interference claim must be dismissed for similar reasons—plaintiff's failure to raise a triable issue as to whether Best's interference with his employment with ABC was accomplished with malice or wrongful means. As an at-will employee with no written contract, plaintiff could only succeed on his tortious interference claim if he established that Best acted solely to harm him or used wrongful means to achieve the interference (*see Guard-Life Corp. v Parker Hardware Mfg. Corp.*, 50 NY2d 183, 194 [1980]; *Miller v Mount Sinai Med. Ctr.*, 288 AD2d 72 [2001]). As discussed, there is no evidence that Best acted solely for the purpose of harming plaintiff; nor is there any other evidence that she utilized fraud, threats or other wrongful means in communicating the actors' complaints to ABC. The tortious interference claim should also have been dismissed.

Union Ratification of Best's Conduct

■ On his cross appeal, plaintiff argues that the motion court erred in finding that the Court of Appeals holding in *Martin v Curran* (303 NY 276 [1951], *supra*) mandated dismissal of his claims against AFTRA. In *Martin*, the Court of Appeals held that under section 13 of the General Associations Law, a plaintiff cannot recover against a labor union for tortious acts committed by one of its members absent a demonstration that such acts were authorized or ratified by all of the union's members. While the *Martin* rule has been the subject of considerable criticism (*see e.g. Jund v Town of Hempstead*, 941 F2d 1271, 1281 [2d Cir 1991]; *Salemeh v Toussaint*, 25 AD3d 411, 413-415 [2006, Saxe, J., dissenting in part]), it remains the law of New York (*Duane Reade, Inc. v Local 338 Retail, Wholesale, Dept. Store Union, UFCW, AFL-CIO*, 17 AD3d 277 [2005], *lv denied* 5 NY3d 797 [2005]; *Building Indus. Fund v Local Union No. 3, Intl. Bhd. of Elec. Workers, AFL-CIO*, 992 F Supp 192 [ED NY

1996]). As the majority of this Court noted in *Salemeh*, any argument that these "stringent pleading and eviden[tiary] requirements for maintaining an action against an unincorporated association . . . should be relaxed is more appropriately directed to the Legislature" (25 AD3d at 411-412). Nor do we find plaintiff's attempt to distinguish this case from *Martin* persuasive.

We have examined the parties' remaining contentions for affirmative relief and find them to be without merit.

Accordingly, the order of the Supreme Court, New York County (Louis B. York, J.), entered July 29, 2005, which granted defendants' motion for summary judgment to the extent of dismissing the complaint against defendant American Federation of Television and Radio Artists, New York Local, and those portions of the complaint against both defendants to the extent they are predicated on defendant Best's statements other than those in a July 24, 1998 letter, and otherwise denied that portion seeking dismissal of the complaint against defendant Best, should be modified, on the law, the motion granted to the additional extent of dismissing the complaint against Best, and otherwise affirmed, without costs. The Clerk is directed to enter judgment in favor of defendant Best dismissing the complaint as against her.

ANDRIAS, J.P., SULLIVAN, WILLIAMS and CATTERSON, JJ., concur.

Order, Supreme Court, New York County, entered July 29, 2005, modified, on the law, the motion granted to the additional extent of dismissing the complaint against Best, and otherwise affirmed, without costs. The Clerk is directed to enter judgment in favor of defendant Best dismissing the complaint as against her.