Porges v Weitz (2022 NY Slip Op 01823)





Porges v Weitz


2022 NY Slip Op 01823


Decided on March 16, 2022


Appellate Division, Second Department


Zayas, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on March 16, 2022
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

VALERIE BRATHWAITE NELSON, J.P.
CHERYL E. CHAMBERS
SHERI S. ROMAN
JOSEPH A. ZAYAS, JJ.


2019-04846
 (Index No. 8206/14)

[*1]Matthew Porges, etc., respondent-appellant,
v
Melani Weitz, appellant-respondent.



APPEAL by the defendant, and CROSS APPEAL by the plaintiff, in an action to recover damages for defamation, from an order of the Supreme Court (Antonio I. Brandveen, J.) entered April 18, 2019, in Nassau County. The order, insofar as appealed from, denied the defendant's motion for summary judgment dismissing the complaint. The order, insofar as cross-appealed from, denied the plaintiff's cross motion for summary judgment on the issue of liability on the first and second causes of action.



O'Connor, O'Connor, Hintz & Deveney, LLP, Melville, NY (Eileen M. Baumgartner of counsel), for appellant-respondent.
The Law Office of Steven Cohn, P.C., Carle Place, NY (Peter Chatzinoff of counsel), for respondent-appellant.



ZAYAS, J.


OPINION & ORDER
This defamation action arises from the defendant's report, via email, to a United States Tennis Association (hereinafter USTA) official, that her son was being bullied by the plaintiff at USTA junior tennis tournaments and at other tennis programs and events. The plaintiff's bullying, the defendant reported, ranged from offensive name-calling to physically menacing behavior, and it caused her to fear for her son's safety. The plaintiff "[couldn't] understand," she wrote, "how a child like [the plaintiff] [was] allowed to continue to compete or even be associated with the USTA." The defendant's email also noted that the plaintiff had been "kicked out" of two tennis facilities and instruction programs on Long Island.
The complaint did not assert that the allegations of bullying were defamatory. It alleged, instead, that the plaintiff had not, in fact, been thrown out of either tennis program, and the defendant's assertions to the contrary were false and caused him "injury in his trade [and] chosen profession." The defendant moved for summary judgment dismissing the complaint, contending, among other things, that the allegedly defamatory statements were protected by the common interest qualified privilege and that there was no evidence that they had been made with malice. The Supreme Court denied the defendant's motion, concluding that she had failed to eliminate triable issues of fact on that point. We disagree. Facts and Procedural History
In 2013, the plaintiff, Matthew Porges, was a member of the USTA and a ranked player in his age group. He trained at several tennis facilities and with various coaches and programs, mainly on Long Island and in Queens. The defendant's son, Daniel, also played USTA junior tennis and knew the plaintiff from tournaments, as well as from group lessons, tennis camps, and other programs.
Problems arose between the plaintiff and Daniel. According to Daniel, the plaintiff, who was much bigger than Daniel, "called [him] names and bull[ied him] as well as other kids." [*2]In terms of the name-calling, "the main two words" the plaintiff used with Daniel were "pussy" and "faggot." This happened during tennis lessons, and also at tournaments. When the plaintiff and Daniel played against each other at a tournament at the Alley Pond Tennis Center, for example, the plaintiff threw his racquet and called Daniel names during changeovers. The plaintiff's mother, Daniel recounted, who was watching the tournament, taunted Daniel during "a good amount of the match." At the end of the match, the plaintiff kicked Daniel's Powerade bottle across the court and picked up Daniel's racquet bag and threw it.
As a result of these and other similar incidents, the defendant called Julie Bliss, who was, at the time, the Director of Junior Competition for the USTA's Eastern section. Bliss's role at the USTA included overseeing all junior tournament play. The defendant told Bliss that Daniel and the plaintiff were both scheduled to play at an upcoming tournament, but, because Daniel was "afraid of [the plaintiff] and the way that he behaved," Daniel did not want to compete against him. More broadly, the defendant said, Daniel "[didn't] need to be bullied every time he play[ed] a match with [the plaintiff], and [she] was afraid for his safety and safety was a huge issue." Bliss asked the defendant to put her concerns in writing.
Accordingly, on August 27, 2013, the defendant emailed Bliss. She began her message by noting that Bliss had told her to "put our conversation [of] last week about [the plaintiff] in writing." The defendant then recounted, in a series of bullet points, that she and Bliss had discussed: the plaintiff's bullying of Daniel; the plaintiff's kicking of Daniel's Powerade bottle and racquet bag after a match; the plaintiff's "calling [Daniel] names I won't repeat"; and that Daniel refused to play in tournaments in which the plaintiff was entered. One of the bullet points stated that the plaintiff "[had] been kicked out of Robbie Wagner Tennis Academy [hereinafter Robbie Wagner TA] and Sportime"—two tennis fitness and instruction facilities on Long Island. The defendant recommended that Bliss "call Mike Kosoff or Lawrence Kleiger [from Sportime] to discuss." The defendant concluded her email by stating: "Based on [the plaintiff's] behavior during the USTA tournaments, I can't understand how a child like this is allowed to continue to compete or even be associated with the USTA. The whole thing is very upsetting to me, I grew up playing USTA tournaments and there has never been any child allowed to behave in this manner and still compete."
Upon receipt of the defendant's email, Bliss reached out to several individuals in the junior tennis community to ask for their input regarding the plaintiff's behavior, including individuals involved with Robbie Wagner TA and Sportime. On September 4, 2013, Michael Kossoff, the Director of Tennis at Sportime's Syosset and Bethpage facilities, responded to Bliss in an email. He wrote: "He [the plaintiff] was a major problem for us, and we no longer allow him to play at our facility. His behavior was [some] of the worst we have ever seen."
That same day, Robbie Wagner, the president and owner of Robbie Wagner Tournament Training (hereinafter RWTT), also emailed Bliss. He said that there were "[n]o real problems" with the plaintiff. But, at the same time, he indicated that the plaintiff's former coach "would not teach him any more," and therefore, the plainitff's family had "left" the program. Wagner noted that, "[t]his semester," the plaintiff was "back" taking private lessons, but he was not "allowed to participate in drill programs at RWTT."
In early September, the defendant emailed Bliss again and shared with her a screenshot of a "very disturbing" message that had been sent by the plaintiff to one of Daniel's friends (another tennis player) through Instagram. The message said, "I would tell u to hang urself in the shower but u prob don't even have one cuz ur house is so small." Daniel told his mother about another incident involving social media, in which the plaintiff posted an embarrassing video on Facebook of a player at Robbie Wagner TA being thrown into a garbage can or dumpster.
In August 2014, the plaintiff, by his parents, commenced this action against the defendant to recover damages for common-law defamation and defamation per se [FN1]. The defamation causes of action were predicated on a single aspect of the email that the defendant sent to Bliss: her assertion that the plaintiff had been kicked out of Robbie Wagner TA and Sportime. According to the plaintiff, he had "never been removed, suspended or kicked out" of either program. The defendant's claims to the contrary, the plaintiff alleged, were part of "a campaign of harassment," [*3]the effects of which included "injury in [the plaintiff's] trade [and] chosen profession."
In June 2018, the defendant moved for summary judgment dismissing the complaint. She contended, among other bases for dismissal, that the allegedly defamatory statements were protected by a qualified privilege and that there was no evidence that they were made with malice, and, in any event, the statements were true, or at least substantially so. The plaintiff opposed the motion and cross-moved for summary judgment on the issue of liability on the common-law defamation and defamation per se causes of action.
In the order appealed from, entered April 18, 2019, the Supreme Court denied the motion and the cross motion, concluding that neither party had demonstrated entitlement to judgment as a matter of law. The defendant appeals, and the plaintiff cross-appeals. Legal Analysis
"The elements of a cause of action for defamation are (a) a false statement that tends to expose a person to public contempt, hatred, ridicule, aversion, or disgrace, (b) published without privilege or authorization to a third party, (c) amounting to fault as judged by, at a minimum, a negligence standard, and (d) either causing special harm or constituting defamation per se" (Greenberg v Spitzer, 155 AD3d 27, 41).
"Courts have long recognized that the public interest is served by shielding certain communications, though possibly defamatory, from litigation, rather than risk stifling them altogether" (Liberman v Gelstein, 80 NY2d 429, 437). A statement is protected by a qualified privilege "when a person makes a bona fide communication upon a subject in which he or she has an interest, or a legal, moral, or social duty to speak, and the communication is made to a person having a corresponding interest or duty" (Garson v Hendlin, 141 AD2d 55, 60 [internal quotation marks omitted]). "The rationale for applying the privilege in these circumstances is that so long as the privilege is not abused, the flow of information between persons sharing a common interest should not be impeded" (Liberman v Gelstein, 80 NY2d at 437).
There is "no bright line test by which the courts identify with exactitude those occasions which are privileged and those which are not" (Garson v Hendlin, 141 AD2d at 61). Of particular relevance here, courts have applied the so-called common interest privilege to shield from defamation litigation statements made "in a good faith effort" (New York Horse Rescue Corp. v Suffolk County Socy. for the Prevention of Cruelty to Animals, 164 AD3d 909, 911) to "address[ ] a potentially unsafe environment which children in [the declarant's] community frequented" (id. at 911), as well as communications that were "motivated by [an] asserted concern for the best interests of the children" to whom the communication pertained (Garson v Hendlin, 141 AD2d at 62). The privilege has also been applied to statements concerning unsportsmanlike behavior and otherwise antisocial conduct —among adults—made by members of a sports club to the club's executives (see Brockman v Frank, 149 Misc 2d 399, 401 [Sup Ct, NY County]). Ultimately, whether the privilege applies turns on whether, given "the relation of the parties" (Lewis v Chapman, 16 NY 369, 375) and the surrounding circumstances, there is a "reasonable ground for supposing an innocent motive for giving the information, and to deprive the act of an appearance of officious intermeddling with the affairs of others" (id. at 375).
We have little difficulty concluding in this case that the defendant established, prima facie, that her email to Bliss was protected by a qualified privilege. The defendant unquestionably had an interest, as a parent, in complying with Bliss's request that she put her concerns in writing and thus reporting, in a more formal way, serious allegations of bullying—none of which, it bears emphasizing, were alleged to be defamatory—that, in her view, put her son's physical and emotional well-being at risk (see New York Horse Rescue Corp. v Suffolk County Socy. for the Prevention of Cruelty to Animals, 164 AD3d at 911; Garson v Hendlin, 141 AD2d at 62). Indeed, the defendant was not only aware of incidents involving Daniel, but other young tennis players as well. They ranged from troublingly offensive name-calling and physically intimidating acts (such as throwing Daniel's racquet bag and kicking his beverage bottle), to posting embarrassing videos of other players on social media, and even suggesting, in a message sent through Instagram, that a child should "hang [him]self in the shower." Society has a strong interest in not "stifling" (Liberman v Gelstein, 80 NY2d at 437) reports of this sort of behavior to the appropriate authorities, whether they be school officials, or, as here, sports administrators (see Garson v Hendlin, 141 AD2d at 62 ["it has been generally agreed that a qualified privilege attaches to communications relative to family matters, made in good faith to the proper parties, by members of a family, intimate friends, and third persons under a duty to speak" (internal quotation marks omitted)]).
Bliss had a corresponding duty, given her role overseeing USTA junior tournaments, to ensure that the integrity of those tournaments was not undermined by unsportsmanlike behavior, and that competitors were free to compete without the fear of being bullied or harassed (see Brockman v Frank, 149 Misc 2d at 401). Moreover, aside from being the parent of a current USTA junior competitor, the defendant herself had grown up playing USTA junior tournaments and remained active in the sport as an adult, which provided a further basis for inferring "an innocent motive for giving the information [about the plaintiff to Bliss]" (Lewis v Chapman, 16 NY at 375).
"The shield provided by a qualified privilege may be dissolved if [the] plaintiff can demonstrate that [the] defendant spoke with malice" (Liberman v Gelstein, 80 NY2d at 437 [internal quotation marks omitted]). Malice, in this context, can be established in two ways: by showing "either common-law malice, i.e., spite or ill will, or . . . actual malice, i.e., knowledge of falsehood of the statement or reckless disregard for the truth" (Laguerre v Maurice, 192 AD3d 44, 49 [internal quotation marks omitted]).
In order to demonstrate the existence of a triable issue of fact with respect to common-law malice, an allegedly defamed plaintiff "must show that a jury could reasonably conclude that the speaker spoke out of spite or ill will, and that such malicious motivation was the one and only cause for the publication" (Hoesten v Best, 34 AD3d 143, 158 [internal quotation marks omitted]). The plaintiff cannot make that showing here. Although he claims that the defendant's communication with Bliss was the product of "a vendetta" against him, the goal of which was "to destroy his reputation and tennis career," we find that narrative fanciful. The extensive submissions provided to the Supreme Court in connection with the summary judgment motion and cross motion make clear that no factfinder could reasonably conclude that the defendant was not motivated, at least in substantial part, by legitimate concerns for her son's emotional well-being and physical safety. On this point, it is worth emphasizing, again, that the central concerns articulated in the defendant's email—about bullying and poor sportsmanship—were not alleged to be defamatory. And it cannot be said that, by including the information about Robbie Wagner TA and Sportime, the defendant "went beyond what was necessary to convey [that central] message" (Berger v Temple Beth-El of Great Neck, 41 AD3d 626, 627). In fact, on other issues discussed in the email, the defendant was circumspect, notably choosing not to repeat the extremely offensive names that the plaintiff had called Daniel, or to mention bullying incidents of which she was aware involving the plaintiff and other children.
Nor is there a triable issue of fact as to actual malice—that is, whether the defendant made the supposedly defamatory statements "with a high degree of awareness of their probable falsity" (id. at 627). When it comes to demonstrating actual malice, the Court of Appeals has observed that "there is a critical difference between not knowing whether something is true and being highly aware that it is probably false" (Liberman v Gelstein, 80 NY2d at 428).
In evaluating whether the defendant would have been highly aware that her statement that the plaintiff had been thrown out of Sportime was probably false, it suffices to note that Kossoff confirmed to Bliss, just days after the defendant emailed Bliss, that this statement was accurate. He wrote that "[the plaintiff] was a major problem for us," "we no longer allow him to play at our facility," and "[h]is behavior was [some] of the worst we have ever seen." And, of course, the defendant had suggested that Bliss reach out to Kossoff "to discuss" the plaintiff's situation with Sportime—which would have been a strange thing for the defendant to do if she believed the information she was conveying was false.
It is true, as the plaintiff argues, that Kossoff attempted to walk back these statements during his deposition, several years after the fact. But Kossoff's backpedaling did not raise a triable issue of fact as to whether the defendant was highly aware of the alleged falsity of her statement at the time she made it (see Sagaille v Carrega, 194 AD3d 92, 96), particularly given other evidence in the record, aside from Kossoff's email, that the plaintiff had, in fact, been asked to leave Sportime, and that Sportime, as an organization, and the Porges family had mutually agreed, when they "parted ways," "not [to] defame each other." In other words, according to Sportime's general manager, "Sportime would not talk poorly about [the plaintiff] and [the plaintiff] would not speak badly about Sportime."
Wagner's response to Bliss's inquiry about the plaintiff's behavior was more measured than Kossoff's. He informed Bliss that there were "[n]o real problems" with the plaintiff. But he also admitted that the plaintiff's former coach "would not teach him any more," and consequently, the Porges family had "left" the program. Wagner went on to say that, although the [*4]plaintiff was "back" taking private lessons, he was not "allowed to participate in drill programs at RWTT."
Certainly a person with knowledge of those facts could fairly conclude that the plaintiff had been asked to leave the Robbie Wagner program, at least for some period of time (cf. Fleckenstein v Friedman, 266 NY 19, 23 ["(w)hen the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done" (internal quotation marks omitted)]). After all, the plaintiff's coach had apparently decided not to work with him anymore. And the plaintiff was not permitted to enroll in drill programs—a decision that, one could reasonably infer, reflected a desire on the part of Robbie Wagner TA to minimize the plaintiff's interactions with other children. Moreover, the defendant stated at her deposition that another parent had told her that the plaintiff had been thrown out of that program. Given all of this, the worst that can be said is that the defendant did not know for sure whether the plaintiff had been removed from Robbie Wagner TA. But uncertainty about the accuracy of information is not enough to establish malice (see Liberman v Gelstein, 80 NY2d at 438).
Accordingly, the Supreme Court should have granted the defendant's motion for summary judgment dismissing the complaint.
In light of our determination, we need not address the parties' remaining contentions.
Therefore, the order is reversed insofar as appealed from, on the law, the defendant's motion for summary judgment dismissing the complaint is granted, and the order is affirmed insofar as cross-appealed from.
BRATHWAITE NELSON, J.P., CHAMBERS and ROMAN, JJ., concur.
ORDERED that the order is reversed insofar as appealed from, on the law, and the defendant's motion for summary judgment dismissing the complaint is granted; and it is further,
ORDERED that the order is affirmed insofar as cross-appealed from; and it is further,
ORDERED that one bill of costs is awarded to the defendant.
ENTER:
Maria T. Fasulo
Clerk of the Court



Footnotes

Footnote 1: The plaintiff's complaint erroneously denominated his request for punitive damages as a separate cause of action, which New York does not recognize (see Gershman v Ahmad, 156 AD3d 868, 868).