[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-11453
_____

D.C. Docket No. 0:14-cv-62649-JIC


PRAKAZREL MICHEL,

Plaintiff - Appellant,

versus

NYP HOLDINGS, INC.,
d.b.a. New York Post,
ISABEL VINCENT,
MELISSA KLEIN,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(March 7, 2016)

Before MARCUS, JORDAN and BLACK, Circuit Judges.

MARCUS, Circuit Judge:

In this defamation case, well-known rapper and philanthropist Prakazrel ("Pras") Michel challenges the truth of an article published about him in the New York Post's Page Six gossip column. The article claimed that Michel had failed to perform as expected as the headliner at a 9/11 charity event for the Hope for Them Foundation with which he was purportedly affiliated. Michel says that the article defamed him because he had no connection to the Foundation and had not been scheduled to perform at the event. The district court dismissed Michel's claims with prejudice, finding that the article presented only non-actionable statements of opinion under New York law.

While we believe the district court correctly dismissed the complaint, we reach that conclusion for different reasons. Because a reasonable reader of the article would have concluded that it presented statements of fact (not just non-actionable opinion), the article is not privileged against a defamation action. But because Michel has failed to adequately plead facts giving rise to a reasonable inference that the defendants published the article with actual malice, he has nonetheless failed to state a claim; accordingly, the complaint was properly dismissed. However, the dismissal should have been entered without prejudice, and Michel given leave to amend his complaint.

**I.**

Plaintiff Michel is a Grammy-winning artist and founding member of the music group the Fugees who currently engages in a series of philanthropic and business ventures.  Page Six is a well-known gossip column run by the New York Post, a widely circulated tabloid newspaper both in New York City and across the country.  On October 5, 2015, Page Six ran a story about Michel, written by Isabel Vincent and Melissa Klein, under the headline "Ex-Fugee rapper bailed on his own 9/11 benefit concert."  The story reads in full:

> Pras Michel, the rapper who co-founded The Fugees, was a no-show as the headliner for a 9/11 charity event in Hell's Kitchen to benefit his own foundation.
>
> His Hope for Them foundation also bounced a check to the venue, falsely claimed MTV sponsored the fund-raiser and failed to register the charity with state officials.
>
> The group claims to minister to the poor in Haiti but distanced itself in promotional material from the country for fear potential donors would confuse it with the disgraced charity run by his cousin, ex-Fugees frontman Wyclef Jean, said a Hope for Them insider.
>
> Jean's Yele Haiti charity was shut after alleged mismanagement. It is under investigation by the state.
>
> "Their whole basis is, 'Don't let anyone know that we're from Haiti,' " the insider said.
>
> Hope for Them was founded in 2011 by Haiti native Mike Jean, a record producer and songwriter.

Michel was listed as a board member on the group's Web site early last week. By Friday, his name had disappeared, and Mike Jean told The Post the Grammy winner wasn't a board member.

The event, at Stage 48 in Hell's Kitchen last Sept. 11, was billed as "Fashion for Charity" to help New Yorkers. Tickets ranged from $40 to $2,000. In addition to a fashion show, Michel was to perform.

The well-established New York Cares charity was also brought in as a sponsor, the insider said.

MTV's logo was prominently featured on promo material. But the insider and MTV told The Post the network was never a sponsor.

The only connection was event hostess Lenay Dunn, a former host of the MTV show "10 on Top."

Organizers said Saturday that the event pulled in $6,000 but $5,600 went to expenses, with $1,100 for Stage 48 and $500 for NY Cares.

Hope for Them owed the venue $1,100 after patrons failed to cover a promised bar minimum, the source said. It bounced a check to the venue, which threatened legal action, according to e-mails from a Stage 48 staffer to Hope for Them.

Mike Jean told The Post the bill was paid late last week. Stage 48 refused to comment, but an e-mail indicated the tab had not been paid as of Friday afternoon.

He said Michel couldn't perform because he had the flu. Michel said NY Cares would be paid.

Alleging defamation and the intentional infliction of emotional distress,

Michel filed suit against the New York Post and the article's authors in Broward

County circuit court in Florida.  The defendants subsequently removed the case to the United States District Court for the Southern District of Florida, alleging diversity of citizenship between the parties.

In his complaint, Michel contests many of the statements in the article and says that publication indicated a "blatant reckless disregard for the truth."  He complains that the defendants falsely stated and/or implied that the Foundation "belongs to Pras," that he bounced a check to a venue, that he falsely claimed MTV sponsored a fundraiser hosted by the Foundation, that he had an obligation to register the charity with the state, that he had an obligation to perform at the charity event, and that he had "bailed on" his own benefit concert.  Among other things, Michel asserted that he "has no relationship with the Foundation" and "never guaranteed a performance at the event."  Thus, the article's assertions to the contrary were false.  Moreover, despite the claims in the headline and article that the event was for a 9/11 charity, 9/11 "had absolutely nothing to do with the charity event in Hell's Kitchen."  Finally, Michel claimed that two days before the article was published, the Foundation's president wrote to the reporters that "Pras is a good friend of the organization and supports our cause but is not a board member."  The reporters allegedly failed to follow up by further investigating that point.  In short, Michel alleged that he "had nothing to do with the event and has no relationship with the foundation."  Michel claimed that the article's publication

imperiled many business ventures in which he was engaged and caused him emotional distress.

The defendants moved to dismiss, arguing that the article is true, that the contested characterizations constituted protected opinion, and that Michel had not pled that the defendants acted with the requisite actual malice. After full briefing and oral argument, the district court dismissed Michel's claims with prejudice. Applying New York law, the district court concluded that the article consisted only of non-actionable statements of opinion. Specifically, the district court determined that the article's tone and the context of its appearance in the Page Six gossip column would cause a reasonable reader to interpret the article's statements as being those of opinion, not fact.

Addressing the Page Six context, the district court wrote this:

> As to the latter, the New York Post's Page Six traffics in celebrity gossip. Its reputation is well-known, and is captured succinctly in the lede to a December 2004 profile published in another prominent New York publication—Vanity Fair:
>
>> Anonymous tips, political agendas, raging lawyers, outrageous sex stories—so goes life at "Page Six," the New York Post gossip column Rupert Murdoch ordered up in 1977. The Page has since broken news of Donald and Marla's affair, Woody Allen's relationship with his "stepdaughter," and Kirstie Alley's possum-nursing fetish. Listening to staffers, sources, and subjects, an alumnus chronicles the feuds, scoops, and characters that

> have made the column as powerful as the
> boldfaced names it covers.
>
> Frank DiGiacomo, The Gossip Behind the Gossip,
> Vanity Fair, Dec. 2004. As such, Page Six is just the
> place that a reasonable reader would "anticipate [the use]
> of epithets, fiery rhetoric or hyperbole."

Moreover, the district court described the tone of the article as suggesting that it was founded on opinion because it was rife with rumor, speculation, and seemingly tenuous inferences. The article also identified the sources of its information, providing the factual basis for those inferences. Having concluded that the article represented protected statements of opinion and, thus, that the complaint should be dismissed, the district court declined to address the defendants' other arguments.

Michel timely filed this appeal.

## II.

We review de novo an order granting a Rule 12(b)(6) motion to dismiss for failure to state a claim. Simpson v. Sanderson Farms, Inc., 744 F.3d 702, 705 (11th Cir. 2014). The allegations in the complaint must be accepted as true and construed in the light most favorable to the plaintiff. Ironworkers Local Union 68 v. AstraZeneca Pharm., LP, 634 F.3d 1352, 1359 (11th Cir. 2011). To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). We are, of course, free to affirm the district court's dismissal on "any ground that is supported by the record." United States v. Elmes, 532 F.3d 1138, 1142 (11th Cir. 2008).

## III.

The suit was commenced in Florida contesting the publication of an article in New York regarding an event that occurred in New York. The district judge concluded that New York law should apply.

In a diversity action such as this one, a federal court must apply the choice-of-law principles of the state in which it sits. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). "Florida resolves conflict-of-laws questions according to the 'most significant relationship' test outlined in the Restatement (Second) of Conflict of Laws." Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc., 485 F.3d 1233, 1240 (11th Cir. 2007); see also Bishop v. Florida Specialty Paint Co., 389 So. 2d 999, 1001 (Fla. 1980). When determining the most significant relationship, the courts consider "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is

8

centered." Bishop, 389 So. 2d at 1001 (quoting Restatement (Second) of Conflict of Laws § 145). These factors are considered "according to their relative importance with respect to the particular issue." Id.

Here, the application of New York law is plainly appropriate for two reasons. First, it is beyond real dispute that New York has the most significant relationship to the case. The article was published in New York, regarding an event that took place in New York, and that allegedly caused harm to Michel's business interests in New York. Both the New York Post and the reporter defendants are domiciled in New York. While Michel is domiciled in Florida, that consideration is of little relative importance. Moreover, Michel consented in his briefing and oral argument before the district court that New York law should apply to the case. He does not contest the application of New York law on appeal and, indeed, cites extensively to New York law in his briefs. Because "no party has challenged the choice of New York libel law, all are deemed to have consented to its application." Celle v. Filipino Reporter Enters. Inc., 209 F.3d 163, 175 (2d Cir. 2000) (citing, inter alia, Templeman v. Chris Craft Corp., 770 F.2d 245, 248 (1st Cir. 1985)).

## IV.

Michel alleges the Page Six article about him was defamatory and caused him significant harm. Under New York law, a defamation claim requires the

plaintiff to show: "(1) a false statement that is (2) published to a third party (3) without privilege or authorization, and that (4) causes harm, unless the statement is one of the types of publications actionable regardless of harm." Stepanov v. Dow Jones & Co., 987 N.Y.S.2d 37, 41–42 (N.Y. App. Div. 2014). "The essence of the tort of libel is the publication of a statement about an individual that is both false and defamatory." Brian v. Richardson, 660 N.E.2d 1126, 1129 (N.Y. 1995). As a matter of constitutional law, where a public figure sues for defamation, he must prove the publication of a knowing or reckless falsehood (the "actual malice" standard) to recover. Ortiz v. Valdescastilla, 478 N.Y.S.2d 895, 898 (N.Y. App. Div. 1984) (citing New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964)).

Here, the parties dispute three points: whether the statements constituted facts or opinions, whether they were published with actual malice, and whether they were actually true. We address each in turn.

## A.

Under New York defamation law, only statements of fact -- as opposed to statements of opinion -- can be actionable. As the New York Court of Appeals has written, "Since falsity is a sine qua non of a libel claim and since only assertions of fact are capable of being proven false, we have consistently held that a libel action cannot be maintained unless it is premised on published assertions of fact." Brian, 660 N.E.2d at 1129; accord Immuno AG. v. Moor-Jankowski, 567 N.E.2d 1270,

10

1275 (N.Y. 1991).  The immunity granted to opinions reflects, in part, the First

Amendment principle that there can be no false ideas.  See Gertz v. Robert Welch,

Inc., 418 U.S. 323, 339–40 (1974).  Thus, in New York, opinions cannot be

grounds for a defamation suit no matter how offensive or offensively framed they

may be.  Mann v. Abel, 885 N.E.2d 884, 885–86 (N.Y. 2008).  Whether a

particular statement constitutes fact or opinion "is a question of law for the courts,

to be decided based on what the average person hearing or reading the

communication would take it to mean."  Davis v. Boeheim, 22 N.E.3d 999, 1004–

05 (N.Y. 2014) (internal quotation marks omitted); see also Mann, 885 N.E.2d at

885.  In making this determination, we note that New York's law on this point is

broader and more protective of speech than the requirements found in the Federal

Constitution.  See Celle, 209 F.3d at 178 ("Unlike the Federal Constitution, the

New York Constitution provides for absolute protection of opinions."); Gross v.

New York Times Co., 623 N.E.2d 1163, 1167 (N.Y. 1993); Immuno AG., 576

N.E.2d at 1278.

When determining whether a statement reflects a fact or an opinion, New

York courts generally engage in a three-part analysis.  The test is well-settled and

requires that courts consider:

> (1) whether the specific language in issue has a precise
> meaning which is readily understood; (2) whether the
> statements are capable of being proven true or false; and
> (3) whether either the full context of the communication

11

in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact.

Davis, 22 N.E.3d at 1005 (internal quotation marks omitted and alterations adopted); Mann, 885 N.E.2d at 886; Brian, 660 N.E.2d at 1129; Gross, 623 N.E.2d at 1167. "The third factor lends both depth and difficulty to the analysis, and requires that the court consider the content of the communication as a whole, its tone and apparent purpose." Davis, 22 N.E.3d at 1005 (internal quotation marks omitted). Thus, New York courts generally analyze the totality of the statements and the context in which they have arisen in order to determine their effect upon the average reader. Brian, 660 N.E.2d at 1129–30; Immuno AG., 567 N.E.2d at 1278. Statements "couched in loose, figurative or hyperbolic language in charged circumstances" are more likely to be deemed opinions. Immuno AG., 567 N.E.2d at 1281. Significantly, the court's role is not to sift through a statement to identify and isolate factual assertions. Rather, the court should weigh the totality of circumstances to determine whether "the reasonable reader would have believed that the challenged statements were conveying facts about the libel plaintiff." Brian, 660 N.E.2d at 1130 (internal quotation marks omitted).

Here, there is no meaningful argument regarding the application of the first two factors. The heart of Michel's claim boils down to the published statements that he was a "no-show" for -- or "bailed on" --  a headlining performance at a

12

benefit concert for "his own" foundation.  Each of these statements would be readily understood by a reasonable reader.  As the defendants write in their briefing before this Court, the term "no-show" is "commonly understood to mean that someone said they would do something but did not."  See also "No-Show," Merriam-Webster Unabridged Dictionary (3d ed. 2015) ("[A] person who is expected but does not show up").  We fully agree with the defendants' interpretation of the statement.  As we see it, the phrase would be readily understood by readers to mean that the plaintiff failed to appear at an event he was otherwise obliged or required to attend, thus satisfying the first prong of New York's fact/opinion analysis.  We also agree that the statement is composed of two separate factual assertions: first, that Michel had some obligation to perform, and second, that he did not perform.  The term "bailed on" would be readily understood as a stronger statement that the plaintiff did not appear after having committed to appear and perform at the charity event.  Plainly, it suggests not only a failure to honor an obligation or commitment to do something, but also that the failure was somehow unwarranted or caused particular harm.  Michel alleges that these statements have impeached his "honesty, integrity, virtues, morals and the like."

The article's statements that Michel was a "no-show" at the charity event are allegedly made more damning because he was the show's "headliner" and the concert was intended to benefit "his own" foundation.  There is little debate about

13

the meaning of "headline" -- a headliner is the star attraction of a show or event whose name takes top billing. "Headliner," Merriam-Webster Unabridged Dictionary (3d ed. 2015). This would be commonly understood by the Post's readers. Those readers would also readily understand that when the Foundation was referred to as "his own" it meant that Michel had some direct, significant, and immediate relationship with the Foundation. Indeed, "his" is a term of possession. Thus, although reasonable readers would not think that Michel "owned" the Foundation, they would be justified in concluding that he had either created or funded the organization or served the charity in some significant way, maybe as an officer, director, employee, or major benefactor of the Foundation, or that he had some other palpable association with the charity. In short, they would believe that he was affiliated in some direct way with the life of the Foundation. These statements allegedly do additional harm to Michel's reputation because they suggest that his failure to appear as the star attraction at his own charity event would do harm to an organization to which he owed particular allegiance. A reasonable reader would have had little difficulty discerning the meaning and import of these statements.

Moreover, each of the statements to which Michel objects is readily capable of being proven true or false. Either Michel was committed to perform at the event or he was not. The exact basis of the commitment to perform is not important.

14

What is essential to the assertion is that there was some basis to conclude that Michel was, in some way, obligated to perform. This is an empirical determination subject to verification. Similarly, Michel either attended and performed at the event or he did not. His attendance or non-attendance is not a matter of subjective opinion; it is a matter of objective empirical fact. True or false, the assertion that Michel was a "no-show" for the benefit concert is plainly a statement of fact. Likewise, Michel's status as the "headliner" for the event is subject to easy verification or refutation. All one would have to do would be to look at the advertisements for the concert or at its program to determine if Michel's name received top billing. Finally, the statement that the Foundation was "his own" can be proven true or false. The article alleges a significant relationship while Michel disclaims any relationship at all. Either Michel had such a relationship with the Foundation or he did not. In either event, the claim -- like all of these statements -- is subject to empirical verification and, thus, falls comfortably within the realm of fact.

Having found that the first two factors for distinguishing between fact and opinion strongly indicate that the challenged statements were factual, we turn to the third prong of the test in order to analyze context. Nothing about the context in which those statements appeared overcomes the conclusion that these statements were assertions of fact. To the contrary, an examination of the context underscores

15

the finding that a reasonable reader would conclude the article presented statements of fact.

A review of salient New York cases sustains this reading.  In Steinhilber v. Alphonse, 501 N.E.2d 550 (N.Y. 1986), the New York Court of Appeals relied on both the broad and immediate context of statements to determine that they represented non-actionable opinion.  The case arose from a message that played for anyone who called a phone number given to members of the Local 1120 union.  Id. at 551.  The message contained a series of crude and juvenile jokes insulting Steinhilber's appearance, intelligence, and talent.  Id.  The Court of Appeals noted that a public debate in the midst of a heated labor dispute was exactly the sort of context in which listeners and readers would anticipate "the use of epithets, fiery rhetoric or hyperbole" without assuming those epithets to be statements of fact.  Id. at 556 (brackets omitted).  Moreover, any listener who missed the broader context would find it "evident that the tape-recorded message was intended to be invective expressed in the form of heavy-handed and nonsensical humor."  Id. at 555.

The controversy in Brian v. Richardson, 660 N.E.2d 1126 (N.Y. 1995), arose from an op-ed published in the New York Times that called for an investigation of an individual for his alleged involvement in stealing proprietary software, among other misconduct.  Id. at 1128.  While the Court of Appeals noted that the article's appearance on the opinion pages was a factor it considered, the

16

statements were not shielded from liability based solely on their placement in a particular section of the paper.  Id. at 1130.  Rather, based on the text of the article itself, the Court of Appeals concluded that a reasonable reader would consider the author to have been making allegations -- as opposed to assertions of fact -- given his self-identification as an interested party, his marshalling of rumors with limited supporting facts, and his call for a full-scale investigation.  Id. at 1131.

Similarly, in Mann v. Abel, 885 N.E.2d 884 (N.Y. 2008), the New York Court of Appeals found challenged statements to be immune where a local newspaper printed on its opinion page a piece very critical of the Rye Town Attorney, Yale Mann.  Id. at 885.  The piece, preceded by an editorial note indicating it was an expression of opinion, referred to Mann as a "political hatchet Mann" and said that he was "leading the Town of Rye to destruction."  Id.   The court concluded that these obviously rhetorical flourishes along with the broad context in which the piece appeared -- on the opinion page with a note indicating that it represented the author's opinion -- were likely to be interpreted by reasonable readers as expressions of opinion.  Id. at 886.

In Levin v. McPhee, 119 F.3d 189 (2d Cir. 1997), the Second Circuit applied New York law when considering a New Yorker article implying that the plaintiff had a hand in committing murder.  Although presented as a work of nonfiction research, the article sent "a number of clear signals" to readers that the particular

allegations were the result of speculation, including describing the events as shrouded in mystery, presenting multiple narratives as "versions" of what may have happened, and labeling one version as "imagined." Id. at 197. In this context, the court concluded that the reader would not have interpreted the allegations to be presentations of fact. Id.

Finally, in contrast, in Gross v. New York Times Co., 623 N.E.2d 1163 (N.Y. 1993), the Court of Appeals declined to grant immunity to statements contained in a series of newspaper articles purporting to show that New York City's Chief Medical Officer had "produced a series of misleading or inaccurate autopsy reports on people who died in custody of the police." Id. at 1165. The articles included interviews with several pathologists and colleagues who described the Medical Officer's work as biased in favor of the police. Id. at 1165–66. The Court of Appeals found that the broad context of the statements -- stories in the news section with the appearance of being the product of careful deliberation -- would give reasonable readers cause to believe the statements were matters of fact. Id. at 1166. Moreover, the articles were written in such a way that charges of specific misconduct, although couched in the language of hypotheses and conclusions, would be interpreted by reasonable readers as statements of fact. Id. at 1168.

An examination of context in this case strongly suggests that the statements at issue would cause a reasonable reader to conclude that the challenged statements were factual assertions and not expressions of opinion.  Neither the broad context nor the specific language employed in the article indicate to readers that the statements were anything but a report of factual events.  First, that the article appeared on Page Six -- a well-known gossip column -- does not require us to conclude that reasonable readers would interpret the reporting of facts on the page to be statements of opinion.  While it is surely true that a reader would not expect to encounter the type of hard-hitting investigative journalism that might appear on the front page of the New York Times or the Washington Post, the mere placement of a story in a particular section of the paper is not enough to categorically preclude it from a defamation action.  Brian, 660 N.E.2d at 1130.  Indeed, in Brian, the New York Court of Appeals applied that rule to the opinion page of the newspaper -- a section far more indicative of opinions than the gossip page.  In short, the article's placement on the gossip page does not, standing on its own, compel finding that the factual averments found in the article must be considered to be opinion.  Huggins v. Moore, 689 N.Y.S.2d 21, 32 (N.Y. App. Div. 1999), rev'd on other grounds, 726 N.E.2d 456 (N.Y. 1999) ("[S]tatements made in . . . a gossip context do not gain some sort of immunity as pseudo-opinion simply because they are not hard news.").

19

Moreover, even a reader of the gossip column would have some reasonable expectation that the celebrity news being reported was actually true as opposed to merely reciting the author's opinion as to what a particular celebrity has been doing.  Further, like the story in Gross, the article here was not presented as breaking news.  Notably, it was not printed until more than three weeks after the events it described.  As in Gross, this might suggest to the reasonable reader that a greater degree of deliberation went into formulating the story, further removing it from the immediacy and contention that marked instances of opinion in cases like Steinhilber.

It is also worth observing that the analysis of broader context is hampered because this case comes before us on a motion to dismiss.  The procedural posture limits the information available for assessing the article's broader context.  Thus, for example, we do not know what other articles appeared on the page that day, to say nothing of the days immediately before and after.  Thus, apart from knowing that Page Six is a gossip column, we know precious little about the context in which the article appeared.  Presumably, other information would become available during the course of discovery.  In any event, the broader context of the article does not decide the matter one way or the other.  And examination of the immediate context found in the article itself removes whatever doubt may remain about the factual nature of the challenged statements.

The immediate context of the allegedly defamatory statements -- the text of the article itself -- would lead a reasonable reader to the conclusion that the article presents factual statements. Indeed, while focused on celebrity behavior instead of the pressing geopolitical issues of the day, the article reads almost exactly like what one would expect from a straight news story. It opens with a lede highlighting the story's main idea: that Michel was a "no-show" at a charity event for an organization with which he had close ties. It then goes on to offer more detail -- supported by quotations from named and anonymous sources -- about that lede. The reader learns from the article that the Foundation bounced a check to the venue and failed to register with state charity officials; that Michel had been listed on the Foundation's website as a board member, although that reference was removed; the date, location, and ticket prices of the event; that NY Cares was a co-sponsor but, despite advertising to the contrary, MTV was not; that the event ended up losing money; that the Foundation's founder said Michel could not perform because he had the flu; and that Michel said NY Cares would be paid. The style and tone of the article are wholly consistent with what one would expect to find in fact-based news reporting. A reasonable reader who happened to pick up the paper would have no indication that the story presented anything other than a factual narrative of events.

21

Unlike in some of the New York cases we have highlighted, there are no overt indications here that the reporters were presenting opinions as opposed to facts. In sharp contrast, in Mann, the publisher included a disclaimer at the top of the article clearly labeling what followed as a statement of opinion. While subtler, the reporter in Levin signaled through the use of such terms as "versions" and "imagined" that he was not offering statements of fact. But here there is no softening language to signal readers that they are not reading a factual account. The article does not open with a disclaimer of opinion. Instead, it opens with a straightforward statement of verifiable fact -- "Pras Michel, the rapper who co-founded The Fugees, was a no-show as the headliner for a 9/11 charity event in Hell's Kitchen to benefit his own foundation." Nor does the rest of the article provide any reason to doubt that the events being described are what actually happened. There is nothing indicating that the article's account of events surrounding the charity is merely a version of what might have happened. Instead, the article presents a litany of factually verifiable statements and direct quotations from sources without any disclaimers -- explicit or implicit -- from which a reader would conclude that those statements were anything less than factual.

Moreover, the article's tone and rhetoric do not implicitly suggest to its readers that they are not reading a factual account of events. In contrast to the overblown rhetoric found in Steinhilber, the unverifiable statements in Mann, or

22

the call for investigation in Brian, the Page Six article about Michel was not couched in loose, figurative, or hyperbolic language or invective that would alert readers they were not reading a factual news account. If the New York Post, in fact, intended the article to be interpreted as an expression of the authors' opinions, it provided no indication of that intent in the article itself.

We add that the article's use of slang terms like "bailed on" and "no-show" is hardly indicative of opinion. The terms are informal, but they are not conjectural, filled with invective, or otherwise indicative of opinion as opposed to fact. One only needs to compare the language used here with the language found in Mann or Steinhilber to see the difference. The rhetorical flights (or excesses) in those cases are not matched by this article's few instances of informal language. The language the article employed would be taken by its readers "to mean that someone said they would do something but did not." This is a factual statement subject to empirical verification and is wholly different from claims that a public official is leading a town to its destruction. Cf. Mann, 885 N.E.2d at 885. A reporter need not write in the Queen's English for a reasonable reader to conclude that an article is presenting assertions of fact.

Likewise, we reject the defendants' suggestion that because the article presents its sources and allows readers to decide the veracity of the article for themselves, the assertion of fact is transformed into an opinion. In Gross, for

instance, the New York Court of Appeals rejected the claim that the stories presented only opinion and instead concluded that they presented actionable statements of fact even though the articles presented quotations from pathologists and other sources of information in support of their general thesis. Gross, 623 N.E.2d at 1168. While the inclusion of the underlying information -- particularly information that runs contrary to the article's conclusion -- for the purpose of allowing readers to decide an issue for themselves can be a factor in determining whether an article ought to be viewed as presenting opinion, that inclusion was not dispositive and did not outweigh the multiple indications already discussed that would lead a reasonable reader to conclude that the article offered factual statements.

Even when viewing the allegedly defamatory statements contained on Page Six in context, a reader would not fairly conclude that they presented only the reporters' opinions. Thus, as we see it, this case could not be dismissed because the article contained only non-actionable opinion.

The district court also erred by relying on a passage chosen from a Vanity Fair article about Page Six's reputation. The clear rule in this Circuit is that consideration of material falling outside the pleadings converts a motion to dismiss into one for summary judgment. See Trustmark Ins. Co. v. ESLU, Inc., 299 F.3d 1265, 1267 (11th Cir. 2002). And in doing so, the judge must give notice to the

parties and allow them 10 days in which to supplement the record. Id. We strictly enforce this rule and require that a case be reversed and remanded in the event that the necessary notice has not been provided. Jones v. Auto. Ins. Co. of Hartford, Conn., 917 F.2d 1528, 1532 (11th Cir. 1990).

In this case, the district court relied on material outside of the pleadings as a primary reason for determining the context of the allegedly defamatory statements. Indeed, the colorful history of Page Six detailed in the Vanity Fair article appears to be the sole basis for the district court's conclusion that "Page Six is just the place that a reasonable reader would anticipate the use of epithets, fiery rhetoric or hyperbole." The district court provided no notice to the parties that it was relying on material outside the pleadings and denied the plaintiff the opportunity to present the court with additional evidence. Thus, we conclude that the district court erred both substantively and procedurally in determining that the Page Six story presented statements of non-actionable opinion.

**B.**

The district court still properly dismissed the complaint because Michel did not adequately plead that the statements were published with actual malice. At the outset, Michel has argued that a complaint should not be dismissed for failure to adequately plead actual malice. Relying on a series of cases issued before the Supreme Court decided Iqbal and Twombly, Michel claims that defamation suits

involving public figures, and thus requiring an allegation of actual malice, should not be dismissed without first conducting discovery.  But these holdings are completely out of line with the current state of the law.  Iqbal itself directly held that malice and other degrees of intent are subject to the plausibility pleading standard.  Iqbal, 556 U.S. at 686–87.  Indeed, after Iqbal and Twombly, every circuit that has considered the matter has applied the Iqbal/Twombly standard and held that a defamation suit may be dismissed for failure to state a claim where the plaintiff has not pled facts sufficient to give rise to a reasonable inference of actual malice.  See Biro v. Conde Nast, 807 F.3d 541, 544–45 (2d Cir. 2015); McDonald v. Wise, 769 F.3d 1202, 1220 (10th Cir. 2014); Pippen v. NBCUniversal Media, LLC, 734 F.3d 610, 614 (7th Cir. 2013); Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 674 F.3d 369, 377 (4th Cir. 2012); Schatz v. Republican State Leadership Comm., 669 F.3d 50, 58 (1st Cir. 2012).  Joining that chorus, we hold that the plausibility pleading standard applies to the actual malice standard in defamation proceedings.

Moreover, application of the plausibility pleading standard makes particular sense when examining public figure defamation suits.  In these cases, there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation.  Indeed, the actual malice standard was designed to allow publishers the "breathing space"

needed to ensure robust reporting on public figures and events. Sullivan, 376 U.S. at 271–72. Forcing publishers to defend inappropriate suits through expensive discovery proceedings in all cases would constrict that breathing space in exactly the manner the actual malice standard was intended to prevent. The costs and efforts required to defend a lawsuit through that stage of litigation could chill free speech nearly as effectively as the absence of the actual malice standard altogether. Thus, a public figure bringing a defamation suit must plausibly plead actual malice in accordance with the requirements set forth in Iqbal and Twombly.

Determining whether an individual is a public figure -- and thus subject to the actual malice analysis -- is a question of law for the court to decide. Brewer v. Memphis Pub. Co., 626 F.2d 1238, 1247 (5th Cir. 1980). There is no question that the plaintiff here is a public figure. He describes himself in his complaint as "a two-time Grammy winning artist, a founding member of the famous music group, the Fugees, and . . . an acclaimed philanthropist." And in subsequent court documents, he describes himself as a "world-renown[ed] philanthropist." Moreover, at oral argument before the district court, Michel's attorney conceded that his client "is a celebrity, he's a public figure." Plaintiff has not argued otherwise in his briefing or oral argument before this Court. The actual malice standard applies to Prakazrel Michel.

To plead actual malice, then, Michel must allege facts sufficient to give rise to a reasonable inference that the false statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." Sullivan, 376 U.S. at 280. The test is not an objective one and the beliefs or actions of a reasonable person are irrelevant. St. Amant v. Thompson, 390 U.S. 727, 731 (1968). Rather, we ask whether the defendant, instead of acting in good faith, actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false. Id.; Silvester v. Am. Broad. Cos., 839 F.2d 1491, 1493 (11th Cir. 1988) (citing Garrison v. Louisiana, 379 U.S. 64, 74 (1964)); Sweeney v. Prisoners' Legal Servs. of New York, Inc., 647 N.E.2d 101, 104 (N.Y. 1995); Hoesten v. Best, 821 N.Y.S.2d 40, 49 (N.Y. App. Div. 2006). The Supreme Court has written that this showing can be inferred in certain circumstances:

> Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

St. Amant, 390 U.S. at 732.

Actual malice requires more than a departure from reasonable journalistic standards. Levan v. Capital Cities/ABC, Inc., 190 F.3d 1230, 1239 (11th Cir. 1999). Thus, a failure to investigate, standing on its own, does not indicate the presence of actual malice. Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 692 (1989); Sweeney, 647 N.E.2d at 104. Rather there must be some showing that the defendant purposefully avoided further investigation with the intent to avoid the truth. Id.; Grier v. Johnson, 648 N.Y.S.2d 764, 768 (N.Y. App. Div. 1996).

Moreover, where the publisher includes information contrary to the general conclusions reached in an article, that showing tends to undermine the claims of malice. See, e.g., Lohrenz v. Donnelly, 350 F.3d 1272, 1286 (D.C. Cir. 2003). For example, where a news report informed its audience that its primary source was "not an unimpeachable source of information," it served to undermine claims showing that the report was issued with actual malice. Silvester, 839 F.2d at 1498. Similarly, where a magazine article cast doubt on its primary source by quoting other individuals calling the source a "liar" and a "con man," but explaining why the magazine chose to rely on the source anyway, the plaintiff had not proven actual malice. McFarlane v. Esquire Magazine, 74 F.3d 1296, 1304 (D.C. Cir. 1996). The reasoning behind the rule is simple. Where a publisher gives readers sufficient information to weigh for themselves the likelihood of an article's

veracity, it reduces the risk that readers will reach unfair (or simply incorrect) conclusions, even if the publisher itself has.  Moreover, discouraging the inclusion of such contrary sources for fear of fueling a defamation lawsuit would run counter to the constitutional goal of promoting the free and robust discussion of public events.  Thus, reporting perspectives contrary to the publisher's own should be interpreted as helping to rebut, not establish, the presence of actual malice.

Here, Michel has not sufficiently pled facts giving rise to a reasonable inference that the defendants published the story knowing that it was false or with reckless disregard for whether it was false or not.  For starters, we can disregard the portions of the complaint where Michel alleges in a purely conclusory manner that the defendants were "reckless" in publishing the article.  Allegations such as these amount to little more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," which are insufficient to support a cause of action.  Iqbal, 556 U.S. at 678.  Setting those aside, there remain two allegations that require further analysis.

First, Michel claims that:

> Defendants wrote, published and disseminated the Article without conducting any due diligence on the matter covered or attempting any real outreach to uncover if any truth existed relating to the matter that was being asserted therein.

This statement treads perilously close to being a conclusory assertion of the elements of the cause of action.  But reading the paragraph favorably for the plaintiff, it asserts the fact that defendants conducted no investigation before reporting the allegedly defamatory statements about Michel.  Even so, this does not make a showing of actual malice.  As we noted already, the failure to investigate, standing alone, does not give rise to a conclusion that the defendants acted with actual malice.  Rather, the plaintiff must plead facts giving rise to a reasonable inference that the defendants acted to intentionally avoid learning the truth.

The complaint here does not present factual allegations sufficient to give rise to such an inference.  More significantly, the conclusory statement is rebutted by the article itself, which was included as an exhibit to the complaint.  See Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1205–06 (11th Cir. 2007) ("[W]hen the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern.").  The article indicates that the reporters spoke with, consulted, or otherwise reached out to a Foundation insider, event organizers, the founder of the Foundation, the venue, the Foundation's website, and state charity records.  The complaint fails to explain why none of that qualified as "real outreach" or due diligence.  That many of the sources were not identified by name does not render them or the reliance on them invalid.  Indeed, reliance on unnamed sources is typical in gossip columns (and in much other reporting as well).  Even if the

statements made in the article were false as an objective matter, the allegations

here are insufficient to show that the defendants knew they were false or acted in

reckless disregard of their falsity.  Rather, the record before the district judge

indicates that the reporters conducted some outreach and engaged in due diligence.

The second allegation that could support a showing of actual malice presents

a closer question, but likewise fails.  The complaint alleges:

> 17. The Article was published on October 5, 2014 at 3:36 a.m. EDT.
>
> 18. On October 3, 2014 at 9:33 p.m. EDT, the Foundation's president wrote to Defendant, Vincent, "[Michel] is a good friend of the organization and supports our cause **but is not a board member.**" (emphasis added)
>
> 19. Vincent and Klein failed to follow up on that statement. They did not ask any further questions about [Michel's] role (if any) with the Foundation. They made no effort to determine whether [Michel] was actually a part of the Foundation after its president explicitly said he was not a board member. They did not even seek to obtain the Foundation's articles of incorporation, which reveal that [Michel] is neither an officer nor director of the Foundation. **Yet, in the first paragraph of the Article, Defendants refer to the Foundation as "his own," in reference to Pras**.

These allegations are significant because they purport to show that two days before

the article was published the defendants had actual knowledge that Michel was not

a board member of the organization, but nonetheless published the article claiming

32

the Foundation was Michel's "own."  Michel argues that this shows, at a minimum, a reckless disregard for the truth.  It does not.

The complaint here really alleges that the reporters should have conducted more investigation after receiving the email from the Foundation's president.  But, again, the failure to investigate does not give rise to a finding of actual malice.  And, indeed, the reporters engaged in more investigation than the plaintiff credits them for.  Even if the reporters stopped all efforts before receiving that email, there is still no basis from which a reasonable inference of actual malice can be drawn.  This is made particularly clear by the portion of the article that reports on the email itself.  The defendants noted in the article that "Michel was listed as a board member on the group's Web site early last week. By Friday, his name had disappeared, and Mike Jean told The Post the Grammy winner wasn't a board member."  Far from intentionally avoiding the truth, the defendants included information contrary to their conclusions in the text of the article itself.  In doing so, they undermined Michel's claim that they acted with actual malice.  See, e.g., Silvester, 839 F.2d at 1498.

Even in light of the email from the Foundation's president, there is no indication that the article's characterization of Michel's relationship with the Foundation was fabricated by the defendants, wholly imaginary, based on an unverified anonymous phone call, inherently improbable, or obviously worthy of

doubt.  See St. Amant, 390 U.S. at 732.  The characterization was based on sources inside the Foundation and the Foundation's own (since revised) website.  No facts alleged in the complaint give rise to an inference that any of these sources were as dubious as an unverified anonymous phone call.  Nor is it inherently improbable that Michel would be affiliated with a charity focused on Haiti given his self-described reputation as a "world-renown[ed] philanthropist" who has "devoted much of his life to assisting those in need in Haiti and elsewhere around the world."  In short, the allegations presented in this portion of the complaint fail to give rise to a reasonable inference of any of the hallmarks of actual malice.

In reply, Michel offers two additional arguments in favor of finding actual malice, but these arguments must be discounted because they depend on facts that were not pled in his complaint.  First, Michel claims in his briefing before this Court that the article's concluding sentence -- "Michel said NY Cares would be paid." -- was an outright falsehood because Michel never made such a statement to the defendants or, in fact, to any individual claiming to represent the New York Post.  Michel argues that the defendants demonstrated actual malice by attributing imaginary statements to him.  But in his complaint, Michel did not allege that this statement was false or misrepresented him.  That assumes significance because he did specifically cite in his complaint to many other allegedly false statements.  Michel cannot now use his briefing to add new allegations and argue that those

34

new assertions support his cause of action. Sterling Fin. Inv. Grp., Inc. v. Hammer, 393 F.3d 1223, 1226 (11th Cir. 2004) ("The law in our circuit is clear that arguments not presented in the district court will not be considered for the first time on appeal." (internal quotation marks omitted); Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.")). Moreover, without any allegation that Michel had been credited with statements he did not make, the district court had no basis from which to draw a reasonable inference that the defendants had acted with actual malice by attributing the statement to Michel. Thus, absent any allegations about the falsity of the article's final sentence, Michel's argument is unpersuasive.

We also discount Michel's arguments regarding the "Post's ongoing campaign" against him. Michel claims that this campaign -- which consists of 10 stories in an eight-month period, significantly more media attention than Michel has received from other news sources -- implies actual malice on the part of the defendants. This argument fails because it depends on facts -- namely, the contents of the other articles -- that were not pled in Michel's complaint. As for the one additional article that was included, Michel makes no allegation that it contains false or defamatory statements. Regardless, without a more detailed pleading, Michel's argument should not be considered on a motion to dismiss.

35

In short, Michel's complaint fails to allege facts sufficient to give rise to a reasonable inference that the defendants published the challenged article with actual malice. Because the district court may be affirmed on any ground appearing in the record, this finding is sufficient to affirm the district judge in large part even if the challenged statements were definitively false and did not constitute expressions of opinion. But this conclusion would not support dismissing the complaint with prejudice, as the district judge did. Federal Rule of Civil Procedure 15(a)(2) advises courts to freely give parties leave to amend their complaints. Here, there is no reason to believe that allowing Michel leave to amend his complaint would be futile or that some other substantial reason exists to deny leave. See Perez v. Wells Fargo N.A., 774 F.3d 1329, 1341–42 (11th Cir. 2014). A dismissal based on the failure to plead facts giving rise to an inference of actual malice should be without prejudice and the plaintiff should have the opportunity to amend his complaint.

## C.

The defendants' final argument that the judgment of the district court should be affirmed because Michel cannot plausibly allege that the article's statements were substantially false is unpersuasive. In support, the defendants point to several apparent inconsistencies in the complaint. Thus, for example, although Michel pled that he had nothing to do with either the Foundation or the charity event, he

36

quotes from an email written by the Foundation's president describing Michel as a good friend of the organization, claims that his appearance at the concert was not "guaranteed" (which could imply some non-guaranteed arrangement), and that the event had nothing to do with 9/11 (which could imply that he had knowledge of the event he claimed he had nothing to do with).

As a common sense matter, these apparent inconsistencies do cast a modest pall on Michel's claims that the article was absolutely false. But that pall is not enough to overcome the presumption we must apply on a motion to dismiss that the allegations in the complaint be accepted as true and taken in the light most favorable to the plaintiff. Ironworkers Local Union 68, 634 F.3d at 1359. Chief among those allegations is that Michel "had nothing to do with the event and has no relationship with the Foundation." While the Court is not bound to accept the truth of general allegations in a complaint where they are contradicted by specific factual details in attached exhibits, Griffin Indus., 496 F.3d at 1205–06, no such contradiction exists here. Indeed, reading whatever inconsistencies exist in the complaint as indicative of the outright truth of the defendants' article would require reading the complaint in the light most favorable to the defendants and not, as the law requires, in the light most favorable to the plaintiff. Interpreting the complaint in favor of Michel at this stage in the proceedings requires crediting the

37

explanations he offers for the apparent contradictions and rejecting the defendants' argument.

Moreover, the actual truth or falsity of a statement seems to be quintessentially a question of fact that ought not to be determined on a motion to dismiss absent some extraordinary factor not present in this case. See Kelley v. Hearst Corp., 157 N.Y.S.2d 498, 500 (N.Y. App. Div. 1956) (observing that "the defense of truth is a triable issue for the jury"). Here, Michel has squarely stated that several of the statements contained in the article were outright falsehoods. The truth of those statements -- whether Michel was affiliated with the Foundation and whether he had been scheduled to perform as the headliner at the charity event -- are questions of empirical fact upon which it would be improper for this Court to rule when weighing a motion to dismiss.

## V.

In short, the district court correctly dismissed the complaint. While the article presented statements of provable fact rather than non-actionable statements of opinion, and thus the alleged defamatory statements were not privileged under New York law, the complaint nonetheless failed to adequately plead facts giving rise to a reasonable inference that the defendants published the article with actual knowledge that it was false or with reckless disregard for whether it was false. The complaint, therefore, fails to state a claim under the First Amendment, although

Michel should be given the opportunity to amend his complaint to plead further facts in support of his claims.  Thus, the district court's ruling is AFFIRMED in part and REMANDED with instructions that Michel be afforded leave to amend his complaint to plead actual malice.

**AFFIRMED in part and REMANDED.**