[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-13406

Non-Argument Calendar

_____

ROY S. MOORE,

                                        Plaintiff-Appellant,

*versus*

GUY CECIL,
PRIORITIES USA,
BULLY PULPIT INTERACTIVE LLC,

                                        Defendants-Appellees,

SENATE MAJORITY PAC, et al.,

2                    Opinion of the Court                    22-13406

                                                            Defendants.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 4:19-cv-01855-CLM

_____

Before NEWSOM, BRANCH, and ANDERSON, Circuit Judges.

PER CURIAM:

Roy Moore appeals from the district court's dismissal of several defamation claims he asserted in a civil suit against the defendants. The dismissed claims centered around (1) several tweets posted on the social media platform Twitter[1] by defendant Guy Cecil, (2) a press release issued by Cecil, on behalf of defendant Priorities USA, after Moore lost a special election for a United States Senate seat in Alabama in 2017, and (3) a digital ad run during the election. He argues that the district court erred in dismissing the tweet-based defamation claims for lack of personal jurisdiction and in dismissing the press release and digital ad

_____

[1] Since the events in this suit, Twitter merged with another corporation and is now known as X. Because the parties still refer to the platform as Twitter and that is how it was known during the underlying suit, we too will refer to the platform as Twitter in this opinion.

defamation claims for failure to state a claim. After review, we affirm.

## I.    Background

In 2017, Jeff Sessions resigned as one of Alabama's United States Senators, and Moore secured the Republican Party's nomination for the special election to fill the empty seat. Doug Jones was the Democratic Party nominee. During the final few weeks leading up to the special election, multiple news media outlets reported that several women had come forward accusing Moore of improper conduct with them in the late 1970s and early 1980s when the women were ages 14 to 18.

Specifically, these reports indicated that Moore, then in his 30s, encountered young girls at a local Alabama shopping mall, and he asked them out. One of these women, Leigh Corfman, alleged that, when she was 14, Moore drove her to his home, took off her clothes and his clothes, and then "touched her over her bra and underpants . . . and guided her hand to touch him over his underwear." A second woman, Beverly Young Nelson, accused Moore of giving her a ride home from her job when she was 16, but when she got in his car, he proceeded to "grop[e]" her and "put[] his hands on [her] breasts." *Text of Beverly Young Nelson's Accusation Against Roy Moore*, N.Y. Times (Nov. 13, 2017), https://www.nytimes.com/2017/11/13/us/politics/text-beverly-young-nelson-statement.html    [https://perma.cc/Y6XX-

XR56].[2] When she tried to fight him off and open the car door, he locked the car doors and "he began squeezing [her] neck attempting to force [her] head onto his crotch" and tried "to pull [her] shirt off." *Id.* He eventually gave up and left her in the parking lot, and she quit her job the next day. *Id.* Moore denied all of the allegations. He ultimately lost the election to Jones.

### A. The Complaint

In 2019, Moore filed a civil complaint in the Northern District of Alabama against Cecil, nonprofit company Priorities USA, marketing services company Bully Pulpit Interactive LLC, the Senate Majority PAC (SMP), and others, alleging, among other matters, claims under Alabama law for defamation. The defamation claims all centered around statements the defendants made involving the allegations of Moore's improper sexual conduct with young girls, and can be grouped into three categories: (1) tweets by Cecil; (2) a press release by Cecil on behalf of Priorities U.S.A.; and (3) a digital ad by Priorities U.S.A. and Bully Pulpit.

#### 1. The Tweets

Moore asserted that four tweets in December 2017 by Cecil, a staunch Democrat and the chairman of Priorities U.S.A., were defamatory. The first of these tweets was in response to a thread

---

[2] The district court considered articles cited by Moore along with other articles such as Nelson's press statement that were central to Moore's claims. Therefore, we rely on these sources as well.

started by Kellyanne Conway, then advisor to President Trump, in which she commented on the media's narrative concerning sexual assault allegations against the then-Senator for Minnesota, Al Franken, a Democrat.  Cecil responded to this thread by tweeting "Breaking: Woman who supports a sexually assaulting pedophile attempts to get the upper hand.  Fails miserably."  While Cecil's tweet did not mention Moore, Cecil later, in the context of this lawsuit, admitted that his tweets referenced the accusations against Moore.

In another tweet, Ward Baker, a Republican strategist, criticized Cecil's statement that certain senatorial candidates for the Democratic Party were "game changers."  In response, Cecil tweeted "It must be a sad life when you sit around thinking of twitter fights to start.  Also, a Republican pedophile is running in Alabama, so, you know, there might be more important things to focus on."

In the third tweet, following the announcement of Jones as the winner of the special election for Sessions's open seat, Cecil tweeted "To the @GOP, we will never forget you chose to support a child predator and we will hold you and every Republican associated with you accountable."

And finally, in another tweet, after the announcement of Jones as the winner, Ronna McDaniel, chairwoman of the Republican National Committee tweeted the following: "This election has always been about the people of Alabama.  Doug Jones now answers to Alabamians, who overwhelming support

President Trump's conservative agenda, not Schumer & Democrat party bosses who prioritize obstruction over tax cuts & economic revival for Americans."  In response, Cecil tweeted "The woman who supported a predator who stalked young girls and assaulted them wants to talk about accountability.  Got it."

### 2.  The Press Release

Additionally, Moore asserted that a press release by Cecil, on behalf of Priorities USA, congratulating Senator-elect Jones was defamatory.  The press release stated as follows:

> Doug Jones has spent decades fighting for Alabamians and will now have the opportunity to continue to do so in the United States Senate.  The people of Alabama sent a message tonight by putting country and state ahead of partisan politics and all Americans will now benefit from their decision.  Unfortunately, the same cannot be said for Donald Trump and national Republicans, who supported a child molester who wants an America where being gay is a criminal offense, women shouldn't run for office, and African Americans are discriminated against at the ballot box, all in service to tax cuts for the rich.  This is a stain on the Republican Party that will last forever.  We will make sure of it.

> Priorities USA was proud to stand up for Doug and against a pedophile by partnering with Senate Majority PAC to run a $1.5 million digital campaign focused on persuading and mobilizing Alabama's voters, particularly those in the African American

community, beginning even before the news broke about allegations against Roy Moore.

Moore asserted that because Cecil had no way of verifying the truth or falsity of the allegations against Moore, he "obviously had to have entertained doubts as to their truthfulness," but still asserted that Moore was a child molester and pedophile with reckless disregard, which demonstrated actual malice.

### 3. The Digital Ad

Finally, Moore asserted that an ad run on digital platforms, such as YouTube, was defamatory. The ad included a series of images with the following text overlay and voiceover:

> If you don't vote, and Roy Moore—a child predator— wins, could you live with that? Your vote is public record, and your community will know whether or not you helped stop Roy Moore. Tuesday, December 12th, vote for Doug Jones for Senate. Paid for by Highway 31 and not authorized by any candidate or candidate's committee. www.highway 31.com.

Moore maintained that the reference to him as a "child predator" was defamatory because it "typically applies to convicted sex offenders who are liable to reoffend." Further, he asserted that to reinforce this "dehumanizing term" the ad included at the end a stock photo of a young pre-pubescent girl. He maintained that the use of such "highly inflammatory language" demonstrated that "the defendants[] deliberately [chose] to defame him" despite the lack of supporting evidence, which demonstrated actual malice.

### B.  Procedural History

#### i.  The initial motion to dismiss and the district court's ruling

The defendants filed a motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(2) and (b)(6), asserting (1) that Moore lacked personal jurisdiction over Cecil, whom had no connection to Alabama, and (2) Moore's complaint failed to state a claim for defamation because it failed to establish actual malice, which was required to succeed on a claim of defamation by a public figure.  In support of the lack of personal jurisdiction part of the motion, the defendants submitted a sworn affidavit from Cecil in which he attested that he was not a resident of Alabama nor was it his domicile, he did not do business or "otherwise engage[] in any persistent course of conduct" in Alabama, he was not present in Alabama when he made the challenged statements nor were the people to whom he made the statements, and he had not consented to personal jurisdiction in Alabama.

Upon review, the district court concluded that it lacked personal jurisdiction over the tweet-based claims.  The district court explained that because Cecil had no contacts with Alabama, Moore had to show that the court had specific jurisdiction over Cecil, which required him to show that the tweets were aimed at the forum state—*i.e.*, Alabama.  Analyzing each of the four tweets, the district court then concluded that none of the tweets were aimed at Alabama.  Rather, it determined that in all of the challenged tweets "Cecil was engaged in a tit for tat with a Republican on a matter of national politics, with an intended

22-13406                Opinion of the Court                9

national audience.    Cecil's intent was not to harm Moore's reputation in Alabama; it was to harm the credibility of . . . other Republicans across the country."    In sum, the district court concluded that "Cecil aimed his tweets at Republicans" across the country and "Moore was merely the tool Cecil used to swing at his opponents" to "'twitter shame' the national Republican Party and those affiliated with it."

Regarding the press release defamation claim, the district court concluded that the press release was aimed at Alabama, and, therefore, it had personal specific jurisdiction over Cecil as to that claim.[3]    However, the district court concluded that Moore had failed to state a defamation claim upon which relief could be granted because Moore failed to plead facts that could establish actual malice.

Finally, regarding the digital ad, the district court concluded that, at the time of the ad, multiple allegations had surfaced that "Moore had made sexual advances towards, and had sexually assaulted, teenage girls," which if believed would support the defendants' use of the term "child predator" in the ad.    And Moore's complaint failed to state a claim because he failed to plead

---

[3] Notably, in its jurisdictional ruling the district court also analyzed whether, because it had personal jurisdiction over Cecil for the press release claim, it would also have pendent personal jurisdiction over Cecil for the tweet-based claims, and it concluded that it would not.  Moore does not challenge that determination on appeal.  Therefore, we do not address it.

facts supporting actual malice, such as any facts that the defendants entertained any serious doubts about the women's allegations.

However, the district court gave Moore a chance to amend his complaint as it related to the press release and the digital ad to cure these deficiencies.

### ii.  *The amended complaint*

Moore filed an amended complaint, reasserting the same defamation claims, along with other claims not at issue in this appeal.[4]  He maintained that the court had personal jurisdiction over the tweet-based claims because the "aim" of the tweets was Moore and the Alabama election, and Cecil should have known that any injury to Moore and resulting litigation would have been in Alabama.

Moore then challenged the constitutionality of the actual malice standard adopted by the Supreme Court in *New York Times v. Sullivan*,[5] arguing that nothing in the Constitution required application of an actual malice standard applied to public figures

---

[4] Moore also raised defamation claims against defendant SMP and other entities related to a television ad, as well as claims of intentional infliction of emotional distress, invasion of privacy (false light), and a violation of the voting rights act.  While those claims are not the subject of this appeal, we note that the district court ultimately permitted the defamation and invasion of privacy claims related to the television ad to proceed to trial.  A jury returned a verdict in favor of Moore on those claims, and he was awarded $8.2 million in damages.

[5] 376 U.S. 254 (1964).

and that *Sullivan* should be revisited. He then argued that he had shown actual malice as to both the tweets and the press release because Cecil's tweets demonstrated his "ill will" and "enmity" toward Moore and his "willingness to publish false statements to destroy [Moore's] reputation in order to further his political aspirations." He maintained that because Cecil had no way to verify the truth or falsity of the sexual misconduct allegations, "Cecil obviously had to have entertained doubts as to their truthfulness," and that he "acted recklessly and without regard for the truth."

Regarding the digital ad, Moore asserted that actual malice could be demonstrated by evidence of general ill will toward him. Therefore, he argued that actual malice was demonstrated as to the digital ad because (1) the ad "threaten[ed] to expose or dox voters" who voted for him; (2) the ad referred to him as a "child predator" without sufficient supporting, verifiable, evidence; and (3) by including a stock photo of a black, preteen girl, the ad implied that Moore "preyed, or will prey on prepubescent black girls, which in today's political climate creates immeasurable hostility," even though the defendants knew that Moore's accusers were white teenage girls.

### iii. Second motion to dismiss and the district court's ruling

The defendants filed a motion to dismiss the amended complaint under Rule 12(b)(2) for lack of personal jurisdiction and under Rule 12(b)(6) for failure to state a claim. They asserted that

nothing in Moore's amended complaint should change the court's previous conclusion that it lacked personal jurisdiction over the claims related to Cecil's tweets, and the fact that Moore was injured while residing in Alabama was irrelevant to the analysis. The defendants also asserted that Moore had failed to plead any factual allegations that supported actual malice with regard to the tweets, the press release, or the digital ad.

The district court determined that Moore's amended complaint suffered from the same deficiencies as the original complaint. With regard to the tweet-based defamation claims, the district court explained that Moore had not alleged any facts to establish personal jurisdiction over Cecil, and it reaffirmed its prior ruling that it lacked jurisdiction.

As for the press release defamation claim, the district court concluded that Moore failed to plead allegations that would establish actual malice. The district court explained that Moore's allegations of Cecil's ill intent to smear Moore so that he would lose the election were insufficient to prove actual malice.

Similarly, the court determined that he failed to plead allegations that would support a finding of actual malice concerning the digital ad. First, with regard to Moore's allegations that the ad threatened to expose or dox voters by falsely stating that their voting records were public, the district court condemned as "deplorable behavior" any suggestion that voters would be exposed or doxed if they voted for a particular candidate. Nevertheless, the court explained that all the threat proved was a

willingness on the defendants' part "to lie about ballot secrecy" to advance their cause to help Jones. It did not show that the defendants entertained "serious doubts" about the veracity of the sexual assault allegations of Corfman and Nelson, so it did not tend to show actual malice. Second, the court rejected the contention that the use of the term "child predator" established actual malice because Corfman's and Nelson's allegations, if true, supported the use of the term, and again, Moore failed to plead that the defendants had doubts about the veracity of the allegations. Third, the district court concluded that the use of the stock image of the preteen black girl did not imply, as Moore alleged, that he has preyed or would prey on prepubescent black girls.[6] The district court explained that:

> viewers of reasonable and common understanding who watch the digital ad would not come away with the message that Moore "has or would prey on prepubescent black girls." Nothing in the ad focuses on the pictured child's race or the race of Moore's accusers. For the brief moments that the girl appears on screen, the message is that the public will know whether the viewer voted. . . . Because the digital ad is not reasonably capable of conveying the meaning that Moore gives it, the court needn't determine whether Moore sufficiently pleaded that the message

---

[6] Under Alabama law, "[w]hether a communication is reasonably capable of a defamatory meaning is a question of law" for the court. *Kelly v. Arrington*, 624 So.2d 546, 548 (Ala. 1993); *see also Bell v. Smith*, 281 So. 3d 1247, 1255–56 (Ala. 2019).

was defamatory or that Defendants acted with actual malice.

Accordingly, the district court dismissed the tweet-based defamation claims against Cecil without prejudice for lack of jurisdiction, and it dismissed the press release and digital ad defamation claims with prejudice for deficient pleading. Moore now appeals that dismissal order.

## II.    Discussion

Moore raises two primary challenges on appeal.[7] First, he argues that the district court erred in concluding that Cecil's tweets were not aimed at Alabama and therefore it lacked personal jurisdiction over the tweet-based defamation claims. Second, he argues that the district court erred in concluding that he failed to

---

[7] Moore also challenges the continuing validity of the actual malice standard set forth in *Sullivan* and argues that his case presents a good vehicle for revisiting *Sullivan*. Although Moore is correct that many commentators and judges have criticized *Sullivan*'s actual malice standard, we are bound to follow *Sullivan* unless and until the Supreme Court itself overrules that decision. *See Motorcity of Jacksonville, Ltd. v. Se. Bank N.A.*, 120 F.3d 1140, 1143 (11th Cir. 1997) (explaining that "circuit courts are bound to adhere to the controlling decisions of the Supreme Court" even if it appears that the reasoning has been called into question); *Jaffree v. Wallace*, 705 F.2d 1526, 1532 (11th Cir. 1983) ("[U]nless we wish anarchy to prevail within the federal judicial system, a precedent of [the Supreme] Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be." (quotations omitted)). In other words, even assuming arguendo that Moore's challenge to the actual malice standard has merit, only the Supreme Court can alter *Sullivan*, and "no other court may correct it." *Jaffree*, 705 F.2d at 1533. Accordingly, we do not address Moore's challenge to *Sullivan*.

22-13406               Opinion of the Court                    15

plead allegations showing actual malice regarding the defamation claims based on the press release and the digital ad. We address each argument in turn.

### A. Personal Jurisdiction

Moore argues that, in its specific personal jurisdiction analysis,[8] the district court erroneously concluded that Cecil's tweets were not aimed at Alabama. Moore maintains that the tweets were aimed at him and the state of Alabama because even though completely unrelated topics were at issue, Cecil responded by bringing up Moore and the Alabama Senate race. In other words, Moore argues that Cecil "literally [made] every conversation about Roy Moore and Alabama" thereby "consistently target[ing]" Moore and Alabama.

"We review de novo [a] dismissal for lack of personal jurisdiction, accepting the allegations in the complaint as true." *See SkyHop Techs., Inc. v. Narra*, 58 F.4th 1211, 1222 (11th Cir. 2023). "When a defendant submits an affidavit contesting the basis for personal jurisdiction, the burden shifts back to the plaintiff to produce evidence to support personal jurisdiction." *Id.* (quotations

---

[8] "There are two types of personal jurisdiction: specific and general. Specific personal jurisdiction is founded on a party's contacts with the forum state that are related to the cause of action. General personal jurisdiction arises from a party's contacts with the forum state that are unrelated to the litigation." *Madara v. Hall*, 916 F.2d 1510, 1316 n.7 (11th Cir. 1990). The district court concluded that Moore only sought to assert specific personal jurisdiction, and Moore does not contest that determination. Accordingly, we examine only whether the district court had specific personal jurisdiction over Cecil.

omitted).  "If the district court makes findings of fact in reaching its personal jurisdiction conclusion, we review those findings for clear error."  *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013).

"A federal district court sitting in diversity may exercise personal jurisdiction [over a nonresident defendant] to the extent authorized by the law of the state in which it sits and to the extent allowed under the Constitution."  *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002).  Thus, to determine whether a court has personal jurisdiction over a nonresident defendant, we generally engage in the following two-step inquiry:

> First, we determine whether the exercise of jurisdiction is appropriate under the forum state's long-arm statute.  Second, we examine whether exercising jurisdiction over the defendant would violate the Due Process Clause of the Fourteenth Amendment, which requires that the defendant have minimum contacts with the forum state and that the exercise of jurisdiction not offend traditional notions of fair play and substantial justice.

*Sloss Indus. Corp. v. Eurisol*, 488 F.3d 922, 925 (11th Cir. 2007) (internal citation and quotations omitted).  However, in the case at hand, "the two inquiries merge, because Alabama's long-arm statute permits the exercise of personal jurisdiction to the fullest extent constitutionally permissible."  *Id.* (citing Ala. R. Civ. P. 4.2(b); *Sieber v. Campbell*, 810 So. 2d 641, 644 (Ala. 2001)).

Defamation is an intentional tort under Alabama law. *See Garcia v. Casey*, 75 F.4th 1176, 1192–93 (11th Cir. 2023). In cases involving intentional torts, one of the applicable tests for determining if the nonresident defendant had the requisite minimum contacts with the forum state for purposes of exercising specific personal jurisdiction "is the 'effects' test utilized in *Calder v. Jones*, 465 U.S. 783 (1984)."[9] *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1220 n.28 (11th Cir. 2009). This test "requires a showing that the defendant (1) committed an intentional tort (2) that was directly aimed at the forum, (3) causing an injury within the forum that the defendant should have reasonably anticipated." *Id.*; *see also Madara*, 916 F.2d at 1516 (explaining that "due process requires the defendant have 'fair warning' that a particular activity may subject him to the jurisdiction of a foreign sovereign," and that the "fair warning requirement is satisfied if the defendant has 'purposefully directed' his activities at the forum," and the injuries in question arise from or relate to the defendant's activities that were aimed at the forum state (quotations omitted)).

In this case, only the second prong of the *Calder* effects test is in dispute—whether Cecil's allegedly defamatory tweets were directly aimed at Alabama. Moore alleged in his amended complaint that Cecil's tweets were intended to refer to Moore in a

---

[9] We have recognized that in cases involving intentional torts, courts may also apply the "traditional minimum contacts test," which involves a "purposeful availment analysis." *Louis Vuitton*, 736 F.3d at 1356. The parties here only discuss personal jurisdiction under the *Calder* effects test. Therefore, we limit our analysis to that test.

disparaging manner and to deter and discourage his supporters and that he suffered harm in Alabama. And on appeal, he maintains that his case is virtually identical to that in *Calder*. We disagree.

In *Calder*, a California actress sued Florida journalists for publishing an allegedly libelous article in the National Enquirer, which was "a national magazine with a large circulation in California" specifically. 465 U.S. at 784–85. The Supreme Court held that personal jurisdiction existed over the non-resident defendant because the article (1) "concerned the California activities of a California resident[,]" and disparaged "the professionalism of an [actress] whose television career was centered in California"; (2) "the article was drawn from California sources"; (3) "the brunt of the harm" to the actress "was suffered in California"; and (4) the defendants "knew that the brunt of [the] injury would be felt by [the actress] in the State in which she live[d] and work[ed] and in which the [magazine had] its largest circulation." *Id.* at 788–90. Thus, Moore argues that jurisdiction lies in his case because as in *Calder*, Cecil's allegedly defamatory tweets focused on Moore; Moore's career is in Alabama; Moore suffered harm as a result of the tweets in Alabama; and Cecil knew that the brunt of the harm would be suffered by Moore in Alabama.

The problem for Moore is that *Calder* does not sweep that broadly. Post-*Calder*, the Supreme Court clarified that a defendant's actions do not create sufficient contacts with the forum state "simply because he allegedly directed his conduct at [a] plaintiff[] whom he knew had . . . connections" with the forum

state. *Walden v. Fiore*, 471 U.S. 277, 289 (2014); *see also Herman v. Cataphora, Inc.*, 730 F.3d 460, 465 (5th Cir. 2013) ("A plaintiff's suffering damage in the forum state is part of the calculus, but for minimum contacts to be present the allegedly defamatory statements must be adequately directed at the forum state."). Thus, simply because the tweets—which never named Moore directly—implicated him and he suffered harm in Alabama is not enough to establish personal jurisdiction.

Furthermore, social media and internet-based activities present a unique context for assessing personal jurisdiction under *Calder*. While we do not have any published case law directly addressing the application of the *Calder* effects test in the social media context, many of our sister circuits have addressed this issue, and we find their analysis persuasive. Those circuits have uniformly held that in determining whether the allegedly defamatory comments or information was directly aimed at the forum, the court must look to the defendant's focus, purpose, and/or intent in posting the information. *See, e.g.*, *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 318 (5th Cir. 2021) ("The key question, under *Calder*, is whether the forum state was the focal point both of the [alleged defamation] and of the harm suffered." (quotations omitted)); *Shrader v. Biddinger*, 633 F.3d 1235, 1241 (10th Cir. 2011) (explaining that in the internet context when determining whether the defamatory information was aimed at the forum state, courts must look for "indications that a defendant deliberately directed its message at an audience in the forum state and intended harm to the plaintiff occurring primarily or

particularly in the forum state"); *Young v. New Haven Advocate*, 315 F.3d 256, 262–63 (4th Cir. 2002) (holding that the application of *Calder* in the internet context "requires proof that the out-of-state defendant's [i]nternet activity is expressly targeted at or directed to the forum state"—*i.e.*, did the defendant "manifest an intent" to direct its internet content to an audience in the forum state). Mere knowledge that the effects of the defendant's conduct would be felt in the forum state, without more, is insufficient. *See Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1077 (10th Cir. 2008) ("[U]nder the *Calder* test[,] plaintiffs . . . must establish . . . not only that defendants foresaw (or knew) that the effects of their conduct would be felt in the forum state, but also that defendants undertook *intentional actions that were expressly aimed at that forum state*." (emphasis in original)); *see also Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 972 (10th Cir. 2022) (explaining that the second prong of *Calder* effects test focuses "on whether the defendant's allegedly tortious conduct was focused on or directed at the forum state—not . . . on whether the defendant's wrongful conduct was focused on or directed at the interests of plaintiffs who reside in or otherwise have significant connections to the forum state").

Thus, where the out-of-state defendant deliberately directs his posting at the plaintiff or at an audience in the forum state, then the "directly aimed at the forum" prong of the *Calder* effects test is satisfied. *See, e.g., Johnson v. Griffin*, 85 F.4th 429, 433–35 (6th Cir. 2023) (holding that personal jurisdiction existed over tweet-based tort claim where the nonresident defendant identified the plaintiff and tagged the plaintiff's employer in the tweet); *Tamburo v.*

*Dworkin*, 601 F.3d 693, 697 (7th Cir. 2010) (holding that personal jurisdiction existed over a defendant who used "blast emails" to defame the plaintiff business and generate a boycott, noting that some of these messages even listed the plaintiff's address and urged people to harass the plaintiff). But where there is no evidence that the defendant posted the allegedly defamatory information hoping to reach the forum state or an audience in the forum state specifically, then the *Calder* effects test is not satisfied. *See, e.g.*, *Blessing v. Chandrasekhar*, 988 F.3d 889, 906–07 (6th Cir. 2021) (holding that the court lacked personal jurisdiction where "[t]here [was] no evidence that the defendants posted the tweets hoping to reach [the forum state] specifically as opposed to their Twitter followers generally"); *Herman*, 730 F.3d at 466 (holding that personal jurisdiction did not exist because, while the plaintiffs demonstrated that the harm caused by the allegedly defamatory statements would be felt in the forum state of Louisiana, they failed to show "that the statements' focal point was Louisiana" and there was no evidence that the statements were directed at Louisiana residents or that the website had a "disproportionately high Louisiana readership"); *Young*, 315 F.3d at 259, 264 (holding court had no personal jurisdiction in Virginia over Connecticut newspapers that posted internet articles that allegedly defamed the warden of a Virginia prison because there was no evidence defendant intended to target a Virginia audience).

Applying these principles to Moore's case, to satisfy the *Calder* effects test for personal jurisdiction, Moore needed to show that Alabama was the focal point of Cecil's tweets, and he failed to

USCA11 Case: 22-13406    Document: 67-1    Date Filed: 07/31/2024    Page: 22 of 28

22                        Opinion of the Court                    22-13406

do so.  There is no evidence that the four tweets in question were directed at Alabama or that Cecil intended to target an Alabama audience as opposed to his followers or a national audience generally.  Accordingly, the district court did not err in holding that it lacked personal jurisdiction over Cecil for the tweet-based defamation claims.  *See Blessing*, 988 F.3d at 906 (holding that the court lacked personal jurisdiction where "[t]here [was] no evidence that the defendants posted the tweets hoping to reach [the forum state] specifically as opposed to their Twitter followers generally"); *Herman*, 730 F.3d at 466 (holding that personal jurisdiction did not exist because, although the plaintiffs demonstrated harm in the forum state of Louisiana, they failed to show "that the statements' focal point was Louisiana" and there was no evidence that the statements were directed at Louisiana residents or that the website had a "disproportionately high Louisiana readership").

### B.  Actual Malice—Digital Ad & Press Release Claims

Moore argues that the district court erred in dismissing his defamation claims related to the press release and the digital ad for failure to state a claim because he alleged facts that would support a finding of actual malice.

We review *de novo* a district court's ruling on a motion to dismiss, "accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003).

To prevent dismissal under Rule 12(b)(6), the plaintiff must allege sufficient facts to state a claim for relief that is "plausible on

its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[A] plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (quotations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

> In Alabama, the elements of a typical defamation claim are:
>
> 1) a false and defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting at least to negligence on the part of the defendant; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement.

*Wal-Mart Stores, Inc. v. Smitherman*, 872 So. 2d 833, 840 (Ala. 2003) (quotations omitted). However, when, as here, the plaintiff is a public figure, the plaintiff must show more than at least negligence on the part of the defendant. *Cottrell v. Nat'l Collegiate Athletic Ass'n*, 975 So. 2d 306, 333 (Ala. 2007). Specifically, the First Amendment requires the public figure plaintiff to demonstrate by clear and convincing evidence that the alleged "defamatory statement was made with '"actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Id.* (quoting *Sullivan*, 376 U.S. at 280). Accordingly, to survive a motion to dismiss, Moore had to plausibly allege in his amended

complaint "facts sufficient to give rise to a reasonable inference that the false statement was made with knowledge that it was false or with reckless disregard of whether it was false or not."[10] *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) (quotations omitted).

Actual malice is a subjective test, requiring the plaintiff to show that the defendant "actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false." *Id.* at 702–03 ("The test is not an objective one and the beliefs or actions of a reasonable person are irrelevant."). Importantly, "[i]ll-will, improper motive or personal animosity plays no role in determining whether a defendant acted with actual malice." *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1198 n.17 (11th Cir. 1999) (quotations omitted); *see also Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 510 (1991) ("Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will."). Additionally, actual malice cannot be found where "the publisher's allegations are supported by a multitude of previous

---

[10] We note that the defendants did not challenge the alleged falsity of the alleged defamatory statements in their motion to dismiss. Instead, they focused solely on the actual malice element. And because we are at the motion to dismiss stage, for purposes of this opinion, we accept as true Moore's allegations in the complaint that the alleged statements were false. *Hill*, 321 F.3d at 1335.

22-13406                Opinion of the Court                25

reports upon which the publisher reasonably relied." *Rosanova v. Playboy Enters., Inc.*, 580 F.2d 859, 862 (5th Cir. 1978).[11]

We begin with the press release.[12] Moore argues on appeal, without citation to any legal authority or supporting argument, that the "use of the word 'pedophile'" in the press release was sufficient to show actual malice because it demonstrated the defendants' recklessness given that "the word was not technically correct for the actual allegations made against Moore." Moore's conclusory assertion is insufficient to properly raise this claim before this Court, and we conclude that he has abandoned any challenge to the dismissal of the press-release-based defamation claim. *LaCroix v. Town of Fort Myers Beach*, 38 F.4th 941, 954 (11th Cir. 2022) ("[W]e will deem an appellant to have abandoned an argument where [he] makes only 'passing references' to it in the background sections of [his] brief—or, for that matter, even the brief's argument section." (quotations omitted)); *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only

---

[11] Decisions of the former Fifth Circuit rendered "prior to the close of business" on September 30, 1981, constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

[12] We note that on appeal the defendants argue that the district court erred in determining that it had personal jurisdiction over Cecil for the press release defamation claim because the press release was not aimed at Alabama. We disagree and conclude that the district court properly determined that it had jurisdiction over the press-release defamation claim for the reasons set forth in its opinion.

passing references to it or raises it in a perfunctory manner without supporting arguments and authority."). Although Moore attempts to rehabilitate his claim by advancing an argument about this issue in his reply brief, "[t]hose arguments come too late." *Sapuppo*, 739 F.3d at 683 (explaining that an appellant cannot use his reply brief to resurrect an abandoned claim and that we will not consider arguments raised for the first time in a reply brief).

Turning to the digital ad, Moore asserts in a conclusory fashion that the clear implication of the ad, particularly because of the image of the young, black girl, was that he "was a child predator, preying upon small black children." He maintains that this implication, coupled with the "lie" that the community would know if someone voted for Moore because voting records were public, demonstrates "a reckless disregard for the truth or falsity of the allegations," which is sufficient to show actual malice. The problem for Moore is that the district court found that "viewers of reasonable and common understanding who watch the digital ad would not come away with the message that Moore 'has or would prey on prepubescent black girls.'" And other than conclusively stating that the opposite is true, Moore has provided no argument or citation to authority to show that the district court erred in its determination. Thus, we conclude that he has abandoned any challenge to the district court's determination that the ad did not imply the defamatory message that Moore claims it did. *See Sapuppo*, 739 F.3d at 681.

Finally, even assuming that his contention that the ad contained a lie about the public availability of voting records is true, it does not support a defamation claim because it is not a false statement about Moore. *See Smitherman*, 872 So. 2d at 840 (explaining that a defamation claim under Alabama law requires "a false and defamatory statement *concerning the plaintiff*" (emphasis added) (quotations omitted)). To the extent that Moore contends that the false statement about the public availability of one's voting records demonstrates actual malice with regard to the ad's use of the term "child predator," the district court properly concluded that it does not. The basis of the "child predator" reference was Corfman's and Nelson's allegations that Moore sexually assaulted them as young teens. The voting-records-related statement does not in any way show that the defendants "actually entertained serious doubts as to the veracity of" Corfman's or Nelson's allegations, or that the defendants were "highly aware that [the allegations were] probably false." *Michel* at 702–03. Indeed, it is undisputed that the allegations that Moore had preyed on young teenage girls were widely published in a multitude of sources at the time of the digital ad, which tends to preclude a finding of actual malice. *See Rosanova*, 580 F.2d at 862. Accordingly, because Moore's amended complaint failed to allege "facts sufficient to give rise to a reasonable inference that the false statement was made with knowledge that it was false or with reckless disregard of whether it was false or not," the district court properly granted the motion to dismiss. *Michel*, 816 F.3d at 702 (quotations omitted).

### III.    Conclusion

For the above stated reasons, the district court properly granted motion to dismiss under Rule 12(b)(2) and (b)(6), and we affirm.

**AFFIRMED.**